*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0234p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

    *v.*

THOMAS W. WILLIAMS,

        *Defendant-Appellee.*

No. 08-4630

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 08-00062-001—John D. Holschuh, District Judge.

Argued: April 30, 2010

Decided and Filed: August 6, 2010

Before: MOORE and GILMAN, Circuit Judges; RUSSELL, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael J. Hunter, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellant. Kevin Michael Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Michael J. Hunter, Kevin W. Kelley, ASSISTANT UNITED STATES ATTORNEYS, Columbus, Ohio, for Appellant. Laura E. Byrum, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. On October 12, 2004, Columbus police officers Robert Vass and T. Pappas pulled up in a police cruiser to a group of

_____

[*]The Honorable Thomas B. Russell, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

1

people standing outside an affordable-housing complex owned by Community Properties of Ohio ("CPO"). Upon exiting the vehicle and moving toward the group, Vass recognized one of its members, Thomas W. Williams, who was standing on the sidewalk and leaning against a car. Vass immediately told Williams that he was "again trespassing on CPO property." In the ensuing interaction, Williams acknowledged in response to questions that there might be a warrant out for his arrest and that he was carrying a gun. The officers arrested Williams, who was later charged with being a felon in possession of a firearm and ammunition.

On Williams's motion, the district court ruled that Williams had been illegally seized, and the court suppressed the physical evidence and Williams's statements during the encounter. The government now appeals, making three arguments: (1) Williams was not seized within the meaning of the Fourth Amendment when Vass first spoke to him; (2) if Williams was seized, Vass had reasonable suspicion to detain him; and (3) even if Vass lacked reasonable suspicion to detain Williams, the emergence of information that Williams was wanted on an arrest warrant constituted an intervening circumstance that attenuated the taint of the unlawful seizure.

After careful review, we **AFFIRM**. Williams was seized: a reasonable person would not have felt free to leave upon being approached by two uniformed officers in a marked car, singled out of a group, and immediately accused of a crime. The seizure was unlawful: Williams was not trespassing or committing any other crime when the officers approached, and the fact that others in his group were drinking publicly and *might* have been trespassing did not constitute reasonable suspicion that Williams himself had recently committed a crime or was about to commit one. Finally, there was no attenuation: Williams's statement about the outstanding warrant, made in response to a question posed by Vass at the outset of the seizure, was not "the product of a free will." *Brown v. Illinois*, 422 U.S. 590, 603 (1975). Thus, the incriminating evidence was "come at by exploitation of th[e] illegality" of the seizure, not "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

# I.  BACKGROUND

We accept the district court's factual findings unless clearly erroneous. *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002).  The district court found the following facts, which the parties do not dispute on appeal:

> Community Properties of Ohio ("CPO") is a subsidized property management company that provides affordable housing to low-income individuals throughout Columbus.  (Test. of Joshua Martin, Suppression Hr'g. Tr. p. 6-7 ("Martin Test.").)  Because a large number of CPO's properties are in high crime areas, CPO has instituted several security programs, one of which is to hire Columbus Police Department officers to patrol CPO properties as special duty officers.  (*Id.* p. 7.)  These special duty officers, who work in full Columbus Police Department uniforms and drive marked Columbus Police Department cruisers, patrol CPO properties and strictly enforce criminal laws and CPO regulations prohibiting, among other things, trespassing and loitering in an attempt to "eliminate the elements" of crime.  (Test. of Robert Vass, Suppression Hr'g. Tr. p. 34 ("Vass Test.").)

> Signs that prohibit trespassing and state that trespassers will be prosecuted are posted on all CPO properties (Def. Supp. Mem. ex.2, doc. # 32), and special duty officers patrolling CPO properties will engage nonresidents in conversation to determine if they are trespassing.  If the nonresident can provide some information indicating that they are a resident's guest, such as a resident's name, or a valid reason for being on the property, then the special duty officer will do nothing other than warn the nonresident that trespassing is prohibited.  (Vass Test. p. 38, 52.)  If the nonresident cannot provide information indicating that they are a resident's guest, or if a special duty officer has to talk to a nonresident about trespassing a second time, the nonresident's name and picture or other identifying information will be entered into the CPO's trespass logbook, a record of all individuals who have been given trespass warnings.  (Martin Test. p. 11; Vass Test. p. 37.)  If a nonresident trespasses on CPO property after having his or her name entered in the logbook, the nonresident is arrested for criminal trespass and taken to jail.  (Vass Test. p. 37.)  The special duty officers, however, have discretion to address situations on a case-by-case basis, and do not have to go through the process of issuing warnings before arresting an individual for criminal trespass.  (*Id.* p. 38-39.)

> At approximately 9:00 p.m. on October 12, 2004, Columbus Police Department Officers Robert Vass ("Vass") and T. Pappas ("Pappas") were working special duty patrol for CPO.  (*Id.* p. 38-39.)

Vass and Pappas were in their cruiser heading southbound on Wilson Avenue to inspect a CPO property located at 1084 East Whittier Street. (*Id.* p. 39.) As they turned onto East Whittier from Wilson Avenue, Vass and Pappas observed a group of four to five individuals standing at various locations in front of 1084 East Whittier. Vass and Pappas parked their cruiser in front of the building and approached the group, and as they did Vass recognized Defendant, who was standing on the sidewalk in front of 1084 East Whittier and was leaning against a car parked in the street. (*Id.* p. 68; Map of 1084 East Whittier Street, Suppression Hr'g. Def. Ex. 1.) Vass recognized Defendant from a prior unrelated instance in which he had arrested Defendant in June 2004. Additionally, Vass testified that he had also given Defendant a verbal trespass warning after seeing him at 1084 East Whittier at some time after June 2004 and before October 2004. (Vass Test. p. 42-44.) Defendant's name had not been entered into the logbook as a result of this warning because he had indicated he was a resident's guest, but Vass had warned him not to trespass on CPO property. (*Id.*)

As he and Pappas approached Defendant, Vass told Defendant that "he was again trespassing on CPO property." (Arrest Information Report, Suppression Hr'g. Gov't. Ex. 3.) Vass then asked Defendant if there were any outstanding warrants for his arrest, and Defendant replied that he thought there might be one related to his June 2004 arrest. Vass told Defendant he would run a warrant check, and then asked Defendant if he was armed. (Vass Test. p. 46.) Defendant replied that he "had to protect himself," which Vass took to mean that Defendant was in fact armed. Vass told Defendant he was going to do a pat-down search, to which Defendant replied that he was carrying a gun, and when Vass conducted the pat-down search he discovered a firearm concealed under Defendant's shirt in the back waistband of his pants. Defendant was then handcuffed and arrested. (*Id.*; p. 70-71.)

*United States v. Williams*, No. 2:08-cr-62, 2008 WL 4758683, at *1–2 (S.D. Ohio Oct. 27, 2008) (unpublished opinion) (footnote omitted).

A grand jury indicted Williams on one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition. Williams filed a motion to suppress the physical evidence and statements he made during the encounter, which the government opposed. Following an evidentiary hearing on June 25, 2008 and supplemental briefing, the district court issued a written opinion granting the motion on October 27, 2008. The government timely appealed, and the district court stayed the case pending appeal.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's legal conclusions in granting a motion to suppress. *United States v. Cohen*, 481 F.3d 896, 898 (6th Cir. 2007). "Where the district court grants a motion to suppress, we view the evidence in the light most favorable to the defendant." *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002).

### B. Whether Williams Was Seized

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This protection, however, applies only if a person is "seized" within the meaning of the Fourth Amendment. *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005). The government contends that Officers Vass and Pappas never seized Williams.

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 438 (1991); *see also Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988) (stating that an individual is seized if "a reasonable person would have believed that he was not free to leave" and noting that the test is an objective one (internal quotation marks omitted)). In addition, an individual must actually submit to the show of authority to be seized within the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *United States v. Jones*, 562 F.3d 768, 774–75 (6th Cir. 2009).[1] For this reason, "a

---

[1]The record makes clear that Williams in fact submitted, and the government does not argue otherwise.

consensual encounter does not amount to a seizure." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007).

Officers do not seize people "merely by approaching individuals on the street or in other public places and putting questions to them." *United States v. Drayton*, 536 U.S. 194, 200 (2002). That said, "words alone may be enough to make a reasonable person feel that he would not be free to leave." *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). We consider the following factors as evidence of a seizure: "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Campbell*, 486 F.3d at 954 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)).

The district court held that Williams was seized as of the officers' initial contact:

> Vass and Pappas arrived on the scene in a marked Columbus Police Department cruiser and exited in full uniform. Once they did, they immediately singled Defendant out of a larger group and approached him. . . . Additionally, as he approached, the first thing that Vass did was accuse Defendant of breaking the law by trespassing. . . . [U]pon being accused of breaking the law by a uniformed police officer, a reasonable person would not feel free to leave.

*Williams*, 2008 WL 4758683, at *4.

We agree with the district court's analysis. Vass and Papas did not draw their weapons or touch Williams. But the fact that there were two officers, that they were in uniform and arrived in a marked police car, and that they immediately focused their attention on one person, Williams, in a group of four or five contributed to their show of authority. And although those facts alone would not reasonably make Williams feel that he could not leave, as the officers could have engaged him in a consensual encounter, the encounter differed markedly from those that we have deemed consensual. It did not involve a nonthreatening question, *see United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000) (defendant not seized when officer merely "asked . . . what he was

doing in the area"), a request for identification that did not imply that compliance was mandatory, *see Campbell*, 486 F.3d at 956 (defendant not seized when officer stated "that he would *like* to see [his] ID"), or a mere request to speak together, *see United States v. Peters*, 194 F.3d 692, 694, 698 (6th Cir. 1999) (defendant not seized when officer approached and asked whether he could speak with him); *United States v. Frazier*, 936 F.2d 262, 265 (6th Cir. 1991) (defendant not seized when two agents approached and inquired whether they could ask him some questions); *United States v. Moore*, 675 F.2d 802, 808 (6th Cir. 1982) (DEA agent did not seize defendant when he approached him and inquired "Can I ask you a few questions" in nonthreatening manner). Here, instead, Vass immediately accused Williams of a crime. A reasonable person would not have felt free to walk away under such circumstances.

In *Florida v. Royer*, 460 U.S. 491 (1983), the Supreme Court cited a criminal accusation by law enforcement as a factor indicating that an individual is seized. *See id.* at 501 (holding that detectives seized the defendant "when the officers identified themselves as narcotics agents, told [him] that he was suspected of transporting narcotics, and asked him to accompany them to the police room"). We have recognized the impact of such an accusation, as well. In *United States v. Tolbert*, 692 F.2d 1041 (6th Cir. 1982), we held that DEA agents seized the defendant when they "approached [her] as she was attempting to enter a taxi, again requested her ticket and identification, informed her that they suspected she was a narcotics courier and . . . asked her to accompany them." *Id.* at 1046. Under those circumstances, we held, "a reasonable person would not have felt free to ignore the agents and depart." *Id.*[2] In *United States v. Saperstein*, 723 F.2d 1221 (6th Cir. 1983), another drug-courier case, we found that a DEA agent had seized the defendant in part because that agent "informed the [defendant] . . . that he specifically had information concerning the [defendant's]

---

[2]We also held that the defendant had not been seized when a different agent stopped her in a different airport earlier that day. In that interaction, the agent "stated that he was attempting to determine if she was transporting drugs and requested her consent to search her purse and luggage." *Tolbert*, 692 F.2d at 1043. (She refused and went on her way unimpeded.) The earlier agent's words were clearly less accusatory than the later agents' statement "that they suspected she was a narcotics courier." *Id.* at 1046.

possible involvement in drug transportation." *Id.* at 1223, 1226 & n.7.[3] And relatedly, in *United States v. Buchanon*, 72 F.3d 1217 (6th Cir. 1995), we held that the defendants were seized in part because "[t]he very act of bringing [a police canine] out to sniff the vehicles tells a reasonable person 'we are investigating you for drugs and you may not move these vehicles until we are through.'" *Id.* at 1225. Other circuits likewise have held that individuals were seized based in part on being accused of a crime. *See United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) (holding that defendant with open beer bottle in hand was seized by officers who "told him he was violating the law"); *United States v. Smith*, 423 F.3d 25, 30 (1st Cir. 2005) (citing, in support of holding that defendant was not seized during encounter, the fact that officers "did not accuse him of any crime"); *Jordan v. City of Eugene*, 299 F. App'x 707, 708 (9th Cir. 2008) (unpublished opinion) (holding that encounter "became a non-consensual seizure when the officer told the plaintiff he needed to speak with him because the officer believed the plaintiff was carrying a gun").

The government contends that a reasonable person would have felt free to leave because Vass's words "were not an unequivocal command or request to stop." Appellant Br. at 15. Although an explicit directive may be sufficient to render an individual seized, *see Richardson*, 385 F.3d at 630 (officer's statement to driver of vehicle, "Okay, just hang out right here for me, okay?" resulted in seizure), it is not essential. The test is not whether police expressly instruct a person not to leave, but whether the totality of the circumstances would convey to a reasonable person that she is not free to leave. *Drayton*, 536 U.S. at 201; *Bostick*, 501 U.S. at 439.

At oral argument, the government suggested that whether a reasonable person would feel free to leave when accused of committing a crime depends on the seriousness of the offense. The government suggested that although a person would not feel free to leave the scene upon being accused of armed robbery, he or she would see departure as an option when the charge is trespassing. We do not find this argument to be persuasive.

---

[3]We recognize that *Royer*, *Tolbert*, and *Saperstein* also involved requests to accompany agents to a separate location for further questioning. Still, in each case we clearly relied on the fact of a criminal accusation in concluding that the defendant was seized, and we consider that fact here.

No reasonable person would feel entitled to ignore an officer, turn, and walk away upon being accused of trespassing under the circumstances in the present case.

Finally, the government argues that a reasonable person may have interpreted Vass's statement that Williams was "again trespassing on CPO property" as an instruction to depart the area or as an inquiry into whether Williams was in fact trespassing. Neither interpretation is plausible. Vass made the statement while advancing toward Williams after pulling up in a marked cruiser; Vass's objective conduct suggested an intent to engage Williams, not send him away. Thus, this case is not like *United States v. Brown*, 310 F. App'x 776 (6th Cir. 2009) (unpublished opinion), cited by the government, in which an officer approached two men while still in her vehicle and expressly "instructed the men to take their activities elsewhere." *Id.* at 777. And Vass's statement plainly was an assertion of fact—in other words, an accusation—not a question inviting Williams to clarify whether he was or was not trespassing.

In sum, viewing the situation in its entirety, we agree with the district court that Williams was seized when Officer Vass accused him of "again trespassing on CPO property." A reasonable person would not have felt free to leave upon being approached by two uniformed officers in a marked car, singled out of a group, and immediately accused of a crime.

## C. Reasonable Suspicion

Because Williams was seized, the Fourth Amendment's protections apply. At the initial point of seizure, the encounter was not a full-blown arrest, but an investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968). We therefore analyze it under the line of cases from the Supreme Court and this circuit applying *Terry*.

"An officer can stop and briefly detain a person when the officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (internal quotation marks, alteration, and emphasis omitted). That suspicion "must be based on specific,

objective facts," *Brown v. Texas*, 443 U.S. 47, 51 (1979); an "inchoate and unparticularized suspicion or 'hunch'" will not suffice, *Terry*, 392 U.S. at 27.  In evaluating whether an officer had reasonable suspicion, we must consider the totality of the circumstances rather than analyze each fact in isolation.  *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *Martin*, 289 F.3d at 398.

In this case, the district court held that Vass lacked reasonable suspicion to detain Williams:

> Vass did not have reasonable suspicion to believe that Defendant was trespassing on CPO property.  Defendant was standing on a public sidewalk when Vass approached and stated that Defendant was trespassing, not on CPO property as the Government argues, and Ohio law clearly states that actual entry onto the premises of another is required to commit trespass.  Ohio Rev. Code Ann. § 2911.21 . . . . The fact that Vass observed Defendant standing on a public sidewalk in front of CPO property would not support a reasonable belief on Vass' part that Defendant was actually trespassing on CPO property . . . . Suspecting that others were violating loitering or open container laws says absolutely nothing about whether Vass had reasonable suspicion to seize and detain *Defendant* to investigate whether Defendant was trespassing.

*Williams*, 2008 WL 4758683, at *5–6.  On appeal, the government argues that the district court failed to take an objective view of the facts and to consider the totality of the circumstances.

Conceding that Williams was not trespassing, loitering, or drinking in public when the officers arrived, the government argues that the officers nonetheless had reasonable suspicion that Williams had *recently* violated the law or *was about to* do so. It points to nine facts:  (1) there had been complaints of drinking and loitering in the area; (2) Williams was standing immediately next to CPO property; (3) others in his group were standing on CPO property; (4) Vass had previously encountered Williams trespassing on CPO property; (5) the group was loitering outside CPO property; (6) some in his group were drinking from open containers; (7) Vass suspected that Williams might have an outstanding warrant; (8) Vass had previously arrested Williams and found him to be armed; and (9) the group was blocking the sidewalk.

These facts do not support an objective finding of reasonable suspicion. Several of these facts must be set aside as simply not probative of potential criminal activity. First, there is no evidence that Williams was in fact trespassing when Vass previously encountered him on CPO property.[4] In fact, at that time, Williams "did identify that he knew somebody at CPO at that property," Vass accepted his explanation for his presence there, and Vass did not write him up for trespassing. Joint Appendix ("J.A.") at 42–43, 53. Second, any loitering is immaterial because loitering is not a crime under state or local law. Third, there is no evidence that Williams and his mates were blocking the sidewalk. This accusation is an attempt to shoehorn Williams into the state's disorderly-conduct provision, which prohibits "[h]indering or preventing the movement of persons . . . upon public . . . property . . . by any act that serves no lawful and reasonable purpose." Ohio Rev. Code § 2917.11 (cited in Reply Br. at 7).[5] Fourth, Vass's subjective suspicion that Williams might be wanted on a warrant was a mere hunch. The fact that a person has previously been arrested cannot provide objective reasonable suspicion that he missed a court appearance; otherwise, officers could detain anyone they know to have pending criminal charges. Fifth, Vass's prior discovery of a gun on Williams's person is not enough for reasonable suspicion that Williams was guilty of being a felon in possession of a firearm on the night in question—otherwise, Vass could stop Williams any time, any place, forevermore—and it is totally irrelevant to whether he was committing any of the criminal violations of which Vass actually suspected him.

Thus, the case for reasonable suspicion boils down to the following two-part thesis: (a) because Williams was standing near CPO property and others in his group were standing on CPO property, where people have been known to trespass, he might have been trespassing just before Vass and Pappas arrived or been getting ready to do so; and (b) because others in his group had open containers, Williams might recently have held or been about to hold one when the officers arrived.

---

[4] In this way, the instant case is distinguishable from *United States v. Reed*, 220 F.3d 476, 477 (6th Cir. 2000) (officer had probable cause to arrest defendant for trespassing on housing development's property based on previous trespass).

[5] In any event, standing on a sidewalk and leaning against a car while spending time with friends is not an "act that serves no lawful and reasonable purpose." Ohio Rev. Code § 2917.11.

Such speculation is insufficient under the Fourth Amendment. That Williams stood on a public sidewalk next to property on which trespassing is a problem is minimally probative of his recent or imminent trespassing. If anything, remaining on public property while others tread on the grass suggests an effort *not* to trespass. Moreover, the argument for reasonable suspicion based on others' drinking and presence on CPO property is weak in light of the Supreme Court's emphasis on "individualized suspicion of wrongdoing." *Chandler v. Miller*, 520 U.S. 305, 313 (1997); *see also United States v. Cortez*, 449 U.S. 411, 418 (1981); *United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) (holding that the fact that police observed one man in defendant's group throw something toward the bushes when they approached "lends little more to the totality of the circumstances" suggesting the defendant's involvement in drug activity). In fact, the argument for trespassing is even more attenuated than that. There is no evidence that all of the other people in Williams's group were nonresidents of the CPO complex. Had at least one been a resident, the others would have been lawful guests. Thus, the government's argument is really that Williams *might* have been trespassing because he was with other people who *might* have been trespassing. This sort of guesswork is not remotely enough for reasonable suspicion.

Considering the totality of the circumstances, then, we agree with the district court that the seizure was unconstitutional.

**D. Attenuation of the Taint**

Finally, the government argues that even if the officers seized Williams without reasonable suspicion, the district court should not have suppressed the physical evidence recovered and the inculpatory statements Williams made during the unconstitutional detention. The government insists that this evidence is admissible because Vass's suspicion that Williams had an outstanding warrant, and Williams's admission of the same, were intervening events that attenuated the taint of the unlawful seizure. The government did not make this argument at the district court, and its contention notwithstanding that fact that "attenuation was at issue below, because the district court applied fruits principles" is a stretch. Reply Br. at 8. "[A]s an appellate court, we do not

ordinarily consider issues that are not raised in the district court." *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009) (holding that the government waived argument that search occurred incident to arrest by failing to present it to the district court); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below."); *Giordenello v. United States*, 357 U.S. 480, 488 (1958) (declining "[t]o permit the Government to inject its new theory into the case at this stage" in a Fourth Amendment case). Nonetheless, we will exercise our discretion to resolve the issue because "the issue is presented with sufficient clarity and completeness." *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988).

"In order to deter law enforcement officials from violating the Fourth Amendment by stopping persons without reasonable suspicion or by arresting them without probable cause, the Supreme Court has directed that 'all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source.'" *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (quoting *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). "This exclusionary rule is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *Id.* The Supreme Court has explained, however, that not all evidence must be suppressed "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Rather, these doctrines will not apply when "the connection between the [detention] and the [evidence] had become so attenuated as to dissipate the taint." *Id.* at 491 (internal quotation marks omitted).

The test for attenuation is whether the evidence sought to be introduced—here, the gun, the ammunition, and Williams's inculpatory statements—"has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal quotation marks omitted). The Supreme Court has set forth three factors to guide this inquiry: "[t]he temporal proximity of the [unlawful detention] and the [emergence of the incriminating evidence

at issue], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

Applying the *Wong Sun*/*Brown* test, we reject the government's attenuation argument. First, Williams's incriminating statements about the outstanding warrant and his firearm possession came immediately after Vass accused him of trespass and unlawfully detained him, and Vass recovered the gun and ammunition moments later. J.A. at 70. That only seconds had passed between the start of the seizure and the emergence of the evidence indicates that the taint of the illegality had not dissipated. *See Brown*, 422 U.S. at 604 & n.11 (holding that fact that less than two hours passed between unlawful arrest and post-*Miranda* confession weighed against dissipation, and emphasizing that *Wong Sun* involved an attenuation period of several days); *United States v. Baldwin*, 114 F. App'x 675, 683–84 (6th Cir. 2004) (unpublished opinion) (holding that passage of two months was insufficient to free confession of taint of illegal search).

Second, there were no intervening circumstances of any consequence between the unlawful detention and the discovery of the incriminating evidence. The government suggests two possibilities. It contends that Vass's belief that Williams had an outstanding warrant constituted an intervening circumstance. The objective circumstances of the encounter make clear that Vass's own intuition, however, did not amount to reasonable suspicion. It was based only on the fact that Williams previously had been charged with a crime. The government next claims that Williams's statement "I think I got one" constitutes an intervening circumstance that purged Williams's subsequent adverse statements and the physical evidence recovered from his person of the unlawful seizure's taint. But this statement—made in response to a question posed by Vass—is not the kind of "intervening spontaneous action" that typically supports attenuation. Certainly, it is a far cry from the circumstances held adequate to purge the taint by the Supreme Court and this court. *See United States v. Ceccolini*, 435 U.S. 268, 279 (1978) (holding witness's testimony admissible because it derived from a police interview of her and was in no way connected to an illegal search of defendant's

business four months earlier); *Wong Sun*, 371 U.S. at 491 (holding defendant's confession admissible, despite the fact that his arrest had been unlawful, because he made the statement upon voluntarily returning to the narcotics bureau several days after being lawfully arraigned and released on personal recognizance); *Pearce*, 531 F.3d at 382 n.2 (holding that even if officer's stop of defendant, who was on foot, was unlawful, search of parked car was justified by different officer observing a gun magazine in plain view in the car); *cf. United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990) (suggesting consultation with an attorney as an important intervening event). In fact, this case looks more like those in which the government has been unable to prove attenuation. *See Buchanan*, 904 F.2d at 355–56 (no intervening circumstances between officers' illegal entry into defendant's home and his consent to a search one hour later; no suggestion that his consent was itself an intervening event); *see also Brown*, 422 U.S. at 604–05 (holding defendant's confession at station-house inadmissible because *Miranda* warning did not attenuate taint of arrest made in violation of probable-cause and warrant requirements and there were no other intervening circumstances); *United States v. Shaw*, 464 F.3d 615, 629 (6th Cir. 2006) (holding that "post-arrest discovery of new evidence" through interviews conducted with witnesses while defendant was being interrogated did not constitute intervening circumstance).

Nor do the Seventh Circuit cases that the government cites establish the existence of any relevant intervening circumstance here. In each of those cases, police detained the defendant illegally, learned of a warrant for his arrest during the illegal detention, and then arrested the defendant and searched him incident to the arrest. *See United States v. Johnson*, 383 F.3d 538, 540 (7th Cir. 2004) (after unlawfully stopping a car and walking up to it, officer "immediately recognized the driver as . . . a man whom he had known for some ten years . . . and whom [the officer] knew to be wanted on an outstanding arrest warrant"); *United States v. Green*, 111 F.3d 515, 517, 521 (7th Cir. 1997) (officers stopped vehicle expecting to find suspect inside, instead found two other men, ran their names, and discovered an outstanding warrant for one of them). Although we have observed that the Seventh Circuit treats the discovery of a warrant as an intervening circumstance sufficient to render incriminating evidence admissible, we have

never adopted its approach as the law of this circuit. *See United States v. Hudson*, 405 F.3d 425, 440–41 (6th Cir. 2005) (noting the holdings of *Green* and *Johnson*, but relying on them for the separate proposition that evidence obtained pursuant to an illegal seizure must be suppressed when the police target the defendant). Other circuits, meanwhile, have applied the exclusionary rule despite the emergence of a valid arrest warrant during the course of an illegal encounter. *See, e.g.*, *United States v. Lopez*, 443 F.3d 1280, 1286 (10th Cir. 2006); *United States v. Luckett*, 484 F.2d 89, 90–91 (9th Cir. 1973). Ultimately, the facts of this particular case guide us. Vass obtained his information by asking Williams a question during an illegal encounter in which a reasonable person would not feel free to leave or to refuse to answer questions. Thus, the information obtained was not "the product of a free will under *Wong Sun*." *Brown*, 422 U.S. at 603. Instead, the statement was itself "primary evidence obtained as a direct result of an illegal . . . seizure" that should be suppressed under the exclusionary rule. *Segura v. United States*, 468 U.S. 796, 804 (1984).[6]

Finally, although Vass's misconduct was not flagrant, his purpose weighs against attenuation. The Supreme Court has explained that the purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant "in the hope that something might turn up." *Brown*, 422 U.S. at 605; *Shaw*, 464 F.3d at 630–31. The purpose of stopping Williams was to seek evidence against him, and toward that end Vass immediately asked several questions related to criminal activity other than trespassing. *See Hudson*, 405 F.3d at 440–41 (distinguishing *Green*, 111 F.3d 515, by reference to the Seventh Circuit's statement that "the purpose of the stop was not to seek evidence against the [defendants]"). Indeed, the warrant and firearm evidence came out *only because Vass asked about it*. *Cf. United States v. Akridge*, 346 F.3d 618, 628 (6th Cir. 2003) (finding attenuation where "police were not specifically in search of the particular evidence sought to be suppressed in this case").

---

[6]Moreover, allowing information obtained from a suspect about an outstanding warrant to purge the taint of an unconstitutional search or seizure would have deleterious effects. It would encourage officers to seize individuals without reasonable suspicion—not merely engage them in consensual encounters—and ask them about outstanding warrants.

The totality of the circumstances, analyzed through the *Brown* factors, makes clear that there was no attenuation of the connection between Vass's unconstitutional seizure of Williams and the incriminating evidence. Rather, this case calls for a straightforward application of the exclusionary rule and the related fruit-of-the-poisonous-tree doctrine. Because the incriminating evidence was "come at by exploitation of th[e] illegality" of the seizure, not "by means sufficiently distinguishable to be purged of the primary taint," *Wong Sun*, 371 U.S. at 488, the district court correctly suppressed it.

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court correctly determined that Officers Vass and Pappas seized Williams without reasonable suspicion of criminal activity. Neither Vass's hunch that Williams might have an outstanding warrant nor Williams's statement "I think I got one" purged the incriminating evidence of the taint of the unlawful seizure. We therefore **AFFIRM** the district court's order granting Williams's motion to suppress and **REMAND** the case to the district court for further proceedings.