RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0018p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

    *Plaintiff-Appellant,*

  *v.*

FODE AMADOU FOFANA,

    *Defendant-Appellee.*

No. 09-4397

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 09-00049—Algenon L. Marbley, District Judge.

Argued: October 11, 2011

Decided and Filed: January 24, 2012

Before: MOORE and ROGERS, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Christopher K. Barnes, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellant. Brian C. DiFranco, DiFRANCO LAW OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:** Christopher K. Barnes, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellant. Brian C. DiFranco, DiFRANCO LAW OFFICE, Columbus, Ohio, for Appellee.

  ROGERS, J., delivered the opinion of the court, in which HOOD, D. J., joined. MOORE, J. (pp. 11–19), delivered a separate dissenting opinion.

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

———————

**OPINION**

———————

ROGERS, Circuit Judge.  As a result of a presumably illegal airport search, the Government learned that Fode Fofana used "Ousmane Diallo" as an alias.  Identification bearing Diallo's name was previously used to open two bank accounts, through which Fofana allegedly committed bank fraud.  In Fofana's federal bank fraud case, the district court suppressed any evidence bearing Diallo's name, and the Government appeals that order.  Although the actual documentation seized during the search must be suppressed, evidence obtained legally and independently of the search is not suppressible, even if the Government cannot show that it would have discovered its significance without the illegal search.  Under the facts of this case, the minimal deterrent effect of suppression is far outweighed by the sweeping burden on the truth-seeking function of the courts.

I.

On November 29, 2007, two U.S. Bank checking accounts were opened in Cincinnati, Ohio, in the name of Ousmane Diallo.  The man produced a passport from Guinea bearing the name Ousmane Diallo for the purpose of opening the accounts, and a photocopy of the passport was added to the record.  On February 15, 2008, the IRS directly deposited $3,787 into one of the checking accounts.  Diallo withdrew $2,500 from that account before U.S. Bank discovered that the money was a tax return belonging to an individual named Allison Miller.  The account was blocked, a police report filed, and U.S. Bank notified the IRS.  On December 12, 2008, the IRS made two direct deposits to one of the checking accounts.  Those deposits were tax returns belonging to an individual named Christopher Marks.  Diallo attempted to make a large cash withdrawal from one of the checking accounts on January 31, 2009, but the transaction was not processed due to the block.  The Government alleges that at this point, the Secret Service had already begun an investigation of the accounts.

Later in the day on January 31, 2009, Fofana arrived at the Port Columbus International Airport. His boarding pass was flagged to identify him as a "Selectee" for additional screening. After Fofana presented a valid state driver's license in the name of Fode Fofana at the security checkpoint, the screening agent informed Fofana that he would need to undergo additional screening. During the search of Fofana's personal items, a TSA agent found various envelopes containing large amounts of cash. The TSA agent then found two unsealed envelopes that "contained something hard and unbendable," but unidentifiable. The TSA agent opened the envelopes and found three passports bearing Fofana's picture but different names. One of the passports contained Fofana's picture and the name Ousmane Diallo.

Upon discovering the passports, the TSA agent contacted law enforcement officers, who subsequently arrested Fofana. The information found pursuant to the search was conveyed to U.S. Bank, and U.S. Bank filed a Suspicious Activity Report (SAR) on February 18, 2009. The bank concluded in the SAR that "the Guinea Passport belonging to Ousmane Diallo was fraudulent" and the actual individual was Fofana.

Fofana was indicted on three counts of possession of a false passport in violation of 18 U.S.C. § 1546(a) as well as two counts of bank fraud in violation of 18 U.S.C. §§ 1344 and 1028A(a)(1). Fofana filed a motion to suppress "all evidence obtained as the result of the unlawful search and seizure of his persons and belongings" at the airport. The district court granted Fofana's motion, finding that the Government failed to meet its burden of establishing that the search was constitutional. The district court concluded that "the extent of the search went beyond the permissible purpose of detecting weapons and explosives and was instead motivated by a desire to uncover contraband evidencing ordinary criminal wrongdoing." The district court stated that "[a]ny evidence that was seized or subsequently obtained as a result of Fofana's unlawful search, including the three passports, will be suppressed." The Government consequently moved to voluntarily dismiss the three counts relating to possession of a false passport.

Fofana then filed a motion in limine "to bar introduction of U.S. Bank account records in the name of Ousmane Diallo, U.S. Bank surveillance videos, and photos of Ousmane Diallo and IRS payment records for Ousmane Diallo's U.S. Bank accounts as fruits of the unlawful search." The district court granted Fofana's motion, concluding that "the Government has not alleged sufficient facts to meet [the] burden of proof to show that the connection of Fofana to his alias would have been made through an independent source or through inevitable discovery." The district court further concluded that the identity exception to the exclusionary rule did not apply because "Fofana is not challenging the presence of his body or identity, but rather evidence of an alias." It is this grant of the motion in limine that the Government timely appeals.

## II.

There is a difference between evidence that the Government *obtains* because of knowledge illegally acquired, and evidence properly in the Government's possession that it *learns the relevance of* because of knowledge illegally acquired. It may be that the latter must be suppressed in some cases. But in the context of the present case, bank records and other evidence that the Government obtained independently of the airport search do not have to be suppressed on account of the unconstitutionality of that search, merely because the relevance or usefulness of that evidence became apparent because of the search.

The reasoning behind this conclusion is strongly supported by case law, although the precise combination of circumstances appears to be unprecedented. First, the actual documents whose suppression is at issue—the bank records reflecting the fraud—were in the possession of the Government entirely free of illegal means. Secondly, the illegal search was not directed to the crime, or even the type of crime, for which the discovered information turned out to be useful, thereby eliminating much of the deterrent effect of suppression in this case. Third, an alternate, more direct deterrent to such searches is clearly present, in the form of excluding the passports from evidence. Fourth, exclusion of the bank records in this case unduly burdens the truth-seeking function of courts by effectively precluding relevant and legitimately obtained evidence from ever being used.

First, the bank records at issue were in the Government's possession entirely free of illegal taint. Indeed, they were largely if not entirely in the Government's possession before the illegal search, and included at least one photograph of Fofana that could link him to the U.S. Bank account once his identity was known. "[T]he government cannot be made worse off because of misconduct than it would have been if the misconduct had not occurred." *United States v. Alexander*, 540 F.3d 494, 503 (6th Cir. 2008) (citing *Nix v. Williams*, 467 U.S. 431, 443-44 (1984)). To the extent that any of the records at issue were obtained by the Government after the airport search, our analysis extends only to those records clearly related to the crime regardless of the Government's knowledge of Diallo's identity. Our holding does not extend beyond such records and those in the Government's possession prior to the search.

The importance of the fact that the evidence was properly in the Government's possession is supported by the holdings of the Supreme Court that voluntary testimony of witnesses is admissible even though information from an illegal search led to the witness's testimony. In *United States v. Crews*, 445 U.S. 463 (1980), the Supreme Court upheld the admissibility of a victim's in-court identification of the defendant even though a photo of the defendant used in a preliminary photo lineup had been unconstitutionally obtained. As the plurality reasoned, "the Fourth Amendment violation . . . yielded nothing of evidentiary value that the police did not already have in their grasp." *Id.* at 475. Similarly, in *United States v. Ceccolini*, 435 U.S. 268 (1978), the Supreme Court upheld the admission of a flower shop employee's testimony impeaching that of a gambling scheme operator accused of perjury where the police learned of the flower shop employee's knowledge as a result of an inquiry following an illegal search of an open drawer in the shop. The Supreme Court emphasized the degree to which the flower shop employee was willing to testify freely, because "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." *Id.* at 276. The Court reasoned that "the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Id.* at 277. The underlying idea

is that a voluntary witness's testimony is independent because it is freely available to be found and used without the necessity of the illegal search.

The same can perforce be said in the present case because the records were not only freely available, but actually were in the possession of the Government independent of the illegal search.  It is only incidental that an illegal search speeded the recognition of the usefulness of the available evidence, or in other words narrowed the investigation. That aspect of *Ceccolini* is just like this case.  *Ceccolini* is not distinguishable because of the Supreme Court's focus on the voluntariness of the testimony.  The voluntariness of the testimony shows the free availability of the evidence; such a showing is entirely unnecessary where the evidence is not only available but independently possessed.  In *Crews*, the Supreme Court explained that "the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity." *Crews*, 445 U.S. at 473.  In this case, if the evidence in the Government's possession obtained before or independently of the search has the capacity to identify Fofana as Diallo, that capacity is wholly separate from the unlawful conduct that first made the police aware of the potential link.

Second, the focus of the airport search was in no way related to the usefulness to the bank fraud prosecution of the information obtained.  The deterrent effect of excluding the evidence is therefore minimal.  The Supreme Court so reasoned in *Ceccolini*.  In that case, there was

> not the slightest evidence to suggest that [the policeman] entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as [this policeman].

*Id.* at 279-80.  In *United States v. Akridge*, 346 F.3d 618, 628 (6th Cir. 2003), we noted that the fact that the officer in *Ceccolini* was "not specifically in search of the particular evidence sought to be suppressed" weighed against suppression when considering the purpose of the misconduct at issue.  In this case, the TSA agent admitted to looking for

contraband. The passports found may be considered such contraband, but what Fofana is moving to suppress is not the passports, but rather the link between him and his alias. That evidence is quite remote from what could reasonably have been expected to result from the search. Suppressing it would have a minimal deterrent effect in the future.

Third, and relatedly, there is a far more direct and effective way to deter illegal searches like the one in this case. The tangible evidence actually found cannot be admitted. In this case the Government was not permitted to use the passports as evidence, and the Government does not challenge this on appeal. Similarly, in *Crews* the Government could not use the photo lineup as evidence against the defendant, and in *Ceccolini* the Government could not use the gambling slips that the policeman wrongly examined. The deterrent effect that results from these suppressions renders minor any additional deterrence from suppression of the testimony, or, in this case, the link between Fofana and Diallo. The deterrent effect of the exclusion of the passports here is particularly powerful since it effectively eliminates the possibility of convicting Fofana of the first three counts of his indictment. Other circuits have held that the exclusionary rule did not apply when a second, more remote set of charges was brought on the same evidence illegally obtained, since the deterrent effect was achieved by suppressing the evidence on the initial charges. *See United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003); *United States v. Varela*, 968 F.2d 259 (2d Cir. 1992); *United States v. Paepke*, 550 F.2d 385 (7th Cir. 1977). The Supreme Court has held that "the benefits of deterrence must outweigh the costs. We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal citations and quotation marks omitted). The suppression of the passports achieves a significant deterrent effect; any marginally increased effect from further suppression cannot be justified when one considers the substantial costs of such an action.

Fourth, exclusion of the bank records in this case would burden the truth-seeking function of the courts in a way closely analogous to the concern expressed by the Supreme Court in *Ceccolini*. *See* 435 U.S. at 277-78. Once the Government learns who

Diallo really is, how is the Government to identify him free of the taint of the underlying knowledge? No matter how investigators finally identify Diallo, the Government will be accused of having used its ill-gotten knowledge in narrowing the investigation. And requiring the police to follow a lot of known false leads appears an undue cost of the exclusionary rule. A more reasonable cost is that the police must find new or different untainted evidence, as they have in this case.

As an example, suppose a girl's body, hidden in a house by a depraved kidnapper, is noticed by an officer conducting an unconstitutional narcotics search. Let us say the officer is relying on a warrant based on a barebones affidavit. How can the police proceed without risking immunizing the kidnapper from prosecution? Do they have to ignore the information by assigning the kidnapping investigation to officers who are unaware of the discovery, thereby continuing an expensive city-wide manhunt? Or by focusing their investigation on the house in question, do they risk the exclusion of any evidence they find as a result of such a focused but otherwise constitutionally conducted investigation? The exclusionary rule cannot force such a Hobson's choice. Instead, the police must proceed by constitutional means to get admissible evidence, but without putting valuable information out of their heads. This approach more properly balances the deterrent rationale of the exclusionary rule with the truth-seeking function of the courts.

In *Ceccolini*, the Supreme Court relied on a similar concern, reasoning that exclusion of live testimony of witnesses "would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby." 435 U.S. at 277. In this case, upholding suppression would just as perpetually keep the very evidence of the bank fraud—the bank records of the fraud—from being presented to the criminal fact finder. The Supreme Court has repeated that "when balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce." *Id*. at 278 (quoting *Michigan v. Tucker*,

417 U.S. 433, 450 (1974)).  Balancing this interest against the comparatively weak Fourth Amendment interests in this case compels the conclusion that the bank records be admitted.

The Eight Circuit reasoned similarly when it encountered a situation similar to the one before us.  In *United States v. Watson*, 950 F.2d 505 (8th Cir. 1991), police wrote down banking information during a search for marijuana and illegal weapons, and subsequently began to investigate Watson's financial activities.  The only information used from the search was Watson's alias and the names of some banks.  The court presumed that the records search was illegal, but nevertheless held that the evidence subsequently obtained was sufficiently attenuated to purge it of possible taint.  "The mere fact that information gained during at illegal search gives rise to a subsequent, separate investigation of an individual does not necessarily taint the later investigation. . . .  Furthermore, if the information merely facilitates or shortens the subsequent investigation, it does not taint the investigation's results."  *Id*. at 507-08.  To find otherwise "would amount to granting the suspect 'life-long immunity from investigation and prosecution.'  In such situations, the societal cost of imposing the exclusionary rule outweighs any deterrent effect."  *Id*. at 508 (quoting *United States v. Friedland*, 441 F.2d 855, 861 (2d Cir. 1971)).

Finally, our holding is consistent with our decision in *United States v. Leake*, 95 F.3d 409 (6th Cir. 1996).  In that case, police learned as a result of an illegal search that Leake went by the alias John Sandusky and that he was involved in a marijuana trafficking conspiracy.  Prior to the search, the police had acquired no evidence linking even Sandusky, Leake's alias, to the conspiracy.  Further, at the suppression hearing, the Government did not produce any evidence linking Leake to Sandusky not the result of the search.  We refused to give the Government a second chance, two years later, to provide such evidence, in a case "brimming with loose ends."  *Id*. at 418 n.18.

III.

We reverse the judgment of the district court and remand for proceedings consistent with this opinion.

_____

**DISSENT**
_____

KAREN NELSON MOORE, Circuit Judge, dissenting. The majority's decision today avoids exclusion of the evidence at issue by patching together elements of various established exceptions to the exclusionary rule and discounting the deterrent value of the rule's application in this instance. The result is troubling and inconsistent with our prior Fourth Amendment jurisprudence. Because none of the established exceptions to the exclusionary rule apply and because there is meaningful and important deterrence to be gained by the evidence's exclusion, I respectfully dissent.

## I. INEVITABLE DISCOVERY, INDEPENDENT SOURCE, AND ATTENUATION

In support of its decision, the majority asserts that "the bank records at issue were in the Government's possession entirely free of illegal taint." Maj. Op. at 5. In making this argument, the majority blurs elements of three exceptions to the fruit-of-the-poisonous-tree doctrine: (1) inevitable discovery; (2) independent source; and (3) attenuation. None of these exceptions apply.

Citing *United States v. Alexander*, 540 F.3d 494 (6th Cir. 2008), the majority invokes the inevitable-discovery doctrine and accompanying principle that the exclusionary rule cannot be applied so as to make the government worse off than if the illegal search or seizure had not occurred. As recognized by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 443-44 (1984), the inevitable-discovery doctrine provides "an exception to the exclusionary rule for evidence . . . that inevitably would have been discovered by lawful means," *United States v. Keszthelyi*, 308 F.3d 557, 573-74 (6th Cir. 2002). However, by the government's own admission, there is no indication that the connection between Fofana and Ousmane Diallo would have inevitably been made. *See* R. 55 (Pretrial Tr. at 6) (government acknowledging that, because of the passport, "law enforcement was able to put [] together" the fact that Fofana was the person who opened the accounts under the alias Ousmane Diallo and that it was "pure speculation" whether

such connection would have been made otherwise). In fact, the government did not even raise the application of the inevitable-discovery doctrine on appeal. Without evidence that the connection between Fofana and Ousmane Diallo would have inevitably been made regardless of the illegal search, I cannot perceive how the majority concludes that exclusion of the bank records places the government in a worse position. To the contrary, exclusion in this instance returns the parties to the status quo prior to the illegal search.

The majority also alludes to the independent-source doctrine, emphasizing that the bank records were lawfully in the government's possession *prior to* the illegal search. While the independent-source doctrine does provide that evidence need not be excluded "where a proper, independent search led to the evidence in question," it is inapplicable here. *United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (unpublished opinion) (quoting *United States v. Dice*, 200 F.3d 978, 984 (6th Cir. 2000)) (internal quotation marks omitted). The majority's argument misses the proper focus of the analysis. The bank records, which bore the alias Ousmane Diallo, were meaningless as against Fofana until the discovery of the passports in Fofana's possession established the connection between Fofana and the alias Ousmane Diallo. Thus, it matters not that the government had the bank records prior to the illegal search because the government would never have known to use those bank records in prosecuting Fofana if not for the illegal search. It is the establishment of the connection between Fofana and the alias Ousmane Diallo that is important for our analysis—not the prior legal possession of the bank records themselves. To make out an independent-source exception the government needed to demonstrate that it had knowledge of the connection between Fofana and Ousmane Diallo via an independent source.[1] The district court was correct in concluding that the government failed to carry its burden in this respect.

Finally, the government invokes the attenuation doctrine citing *United States v. Crews*, 445 U.S. 463 (1980), and *United States v. Ceccolini*, 435 U.S. 268 (1978). The

---

[1]As with inevitable discovery, the government bears the burden of proving that such evidence was in fact available via an independent, untainted source. *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996).

Supreme Court has explained the attenuation doctrine as follows: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). The Supreme Court has suggested three factors to guide the attenuation analysis: "the temporal proximity of the [illegality] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010) (alterations in original omitted) (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

The cases that the majority cites in support of its attenuation argument are not analogous. The Supreme Court in *Crews* based its finding of attenuation on the fact that "the police's knowledge of respondent's identity and the victim's independent recollections of him both antedated the unlawful arrest and were thus untainted by the constitutional violation." 445 U.S. at 477. In other words, the Supreme Court found that the identifying link connecting the defendant to the crime, *i.e.*, the witness's independent knowledge, existed prior to and independent of the illegality. Although the police had knowledge of the bank records' existence prior to the illegality, as the police in *Crews* had knowledge of the "respondent's identity," the police did not have knowledge of the link between Fofana and the alias. The link between Fofana and the alias is the identifying link crucial to the *Crews* holding: "the victim's independent recollections" connecting the respondent to the crime. As a result, the illegal search at issue here, as opposed to that in *Crews*, did provide something "of evidentiary value that the police did not already have in their grasp" by "link[ing] together two extant ingredients in [the] identification"—Fofana and the alias Ousmane Diallo. *Id.* at 475.

In *Ceccolini*, the Supreme Court concluded that witness testimony given as "an act of . . . free will" after "[s]ubstantial periods of time elapsed between the time of the

illegal search and the initial contact with the witness . . . and the testimony at trial" was sufficiently attenuated. 453 U.S. at 279. The present case involves physical evidence rather than witness testimony and, therefore, excludes the possibility that free will could remove the taint. *See United States v. Akridge*, 346 F.3d 618, 633-34 (6th Cir. 2003) (Moore, J., dissenting) (listing five considerations informing the Supreme Court's inquiry in *Ceccolini* and identifying the element of free will as the most important). The bank records in question, unlike the testifying witness in *Ceccolini*, have no independent identifying ability and, therefore, are unable to bridge the connection between Fofana and Ousmane Diallo apart from the taint of the illegal search. In addition, there was not a significant lapse in time between the illegal search and use of information gained by the illegal search. The illegal search occurred in November 2007 and U.S. Bank filed the Suspicious Activity Report implicating Fofana less than three months later. R. 46 (Suspicious Activity Report at 4).[2] In short, there is no attenuation to purge the taint between the illegal search and the identification of Fofana as synonymous with Ousmane Diallo. It is clear that the illegal search has been exploited in order to marshal the bank records in the government's possession against Fofana.

## II. DETERRENCE AND SOCIAL COSTS

The majority's final three arguments relate to deterrence and the attendant social costs of exclusion. Specifically, the majority argues that: (1) exclusion would serve only minimal deterrent value because the illegal search was not conducted for the purpose of uncovering the evidence at issue; (2) exclusion of the bank records provides only minimal incremental deterrence because the passports have already been excluded; and (3) exclusion would burden the truth-seeking function of the courts. I disagree.

First, the majority states that the evidence should not be excluded because "the focus of the airport search was in no way related to the usefulness of the information obtained to the bank fraud prosecution" and, therefore, the "deterrent effect of excluding

---

[2]Moreover, the majority's statement that "[i]t is only incidental that an illegal search speeded the recognition of the usefulness of the available evidence" confuses attenuation with inevitable discovery. Maj. Op. at 6.

the evidence is . . . minimal." This statement is simply inaccurate. Maj. Op. at 6. By the Transportation Security Administration ("TSA") agent's own admission, the purpose of the illegal search was to uncover contraband. R. 26 (Suppression Hr'g Tr. at 97). Thus, while we do not know precisely what the agent expected (or hoped) to find, we do know that the agent's searching activities were aimed at implicating Fofana in criminal wrongdoing. By finding the passports connecting Fofana to Ousmane Diallo, the agent succeeded in this aim regardless of whether the agent specifically foresaw and intended this exact result.[3] Allowing successful prosecution based on the fruits of this search creates incentives for agents to engage in similar conduct in the future.

Moreover, the circumstances of this search are sufficiently distinguishable from those in *Ceccolini*. In *Ceccolini*, the officer observed an envelope with incriminating evidence while in a flower shop "spending his short break engaged in conversation with his friend Lois Hennessey." 435 U.S. at 270. Given the incidental, casual encounter in *Ceccolini* between the officer and his friend, the flower shop employee, it is easy to see how the Court was confident that there was no future misconduct to deter. In contrast, the search in question occurred in conjunction with an administrative TSA search, to which TSA reports approximately two million travelers are subjected each day.[4] Given the broad discretion already granted to TSA agents to search the traveling public, it is important to deter unconstitutional conduct and to ensure that TSA's broad powers are not improperly exploited for law-enforcement purposes. Suppressing the bank records serves this precise deterrent purpose.

Second, the majority states that because the passports have been suppressed, suppression of the bank records will achieve only minimal incremental deterrence. I disagree. Although suppression of the passports has some deterrent effect, it is not

---

[3]In this sense, this case is distinguishable from *United States v. Akridge*, 346 F.3d 618, 628 (6th Cir. 2003). In that case, the "officers were responding to a complaint about drug trafficking from Akridge's apartment" and "not specifically in search of the particular evidence sought to be suppressed in this case, *i.e.*, witness testimony." *Id.* Moreover, in *Akridge*, this Circuit recognized that "a clear intent to uncover illegality through illegal means would seem to weigh in favor of suppression." *Id.*

[4]Transportation Security Administration, *TSA Myth or Fact: Leaked Images, Handcuffed Hosts, Religious Garb, and More!*, THE TSA BLOG (Nov. 18, 2010), http://blog.tsa.gov/2010/11/tsa-myth-or-fact-leaked-images.html (last visited Jan. 18, 2012).

enough given the significant benefit in using the information obtained from the passports to pursue the bank-fraud prosecution. In fact, in light of the usefulness of the information obtained from the illegal search, the government may view the suppression of the passports as a worthwhile sacrifice. Particularly in the context of airport administrative searches, it is important to maintain an incentive structure that does not encourage illegal behavior by ultimately permitting law enforcement to utilize evidence obtained as a result of misconduct in aid of significant prosecutions.[5] Suppressing the bank records achieves precisely this deterrent effect.

Third, the majority argues that the bank records should not be excluded because doing so "would burden the truth-seeking function of the courts." Maj. Op. at 8. In support, the majority presents a kidnaping hypothetical and admonishes the use of the exclusionary rule to "force . . . a Hobson's choice." *Id.* This argument overlooks a crucial reality of this case: The government was in no way forced into a Hobson's choice. The government could have structured its investigation to insulate the admissibility of the bank records as against Fofana via the various established exceptions to the fruit-of-the-poisonous-tree doctrine. After learning of the connection between Fofana and Ousmane Diallo, the government could have pursued an independent investigation to procure this connection via an independent source. *See Wong Sun*, 371 U.S. at 487. This is in fact more or less what occurred in *United States v. Watson*, 950 F.2d 505 (8th Cir. 1991), which the majority cites favorably in support of its position.[6]

---

[5]Moreover, the cases the majority cites as supporting its position are distinguishable. Each case involved the use of evidence obtained via illegal means in support of charges lodged in response to criminal activity undertaken *after* the illegal search or seizure took place—not in support of charges lodged as a result of knowledge obtained pursuant to the illegal search or seizure about previous criminal wrongdoing. *See United States v. Awadallah*, 349 F.3d 42, 73-75 (2d Cir. 2003) (admitting false statements to grand jury obtained in conjunction with an illegal detention in aid of perjury charges lodged after the false grand jury testimony because "it is untenable to say that the FBI agents . . . sought to elicit perjury rather than truthful information"); *United States v. Varela*, 968 F.2d 259, 260, 262 (2d Cir. 1992) (holding that the exclusionary rule does not bar "the use of unlawfully obtained post-arrest statements . . . to prove that [a defendant] subsequently committed" perjury where the perjury occurred after the "unlawful arrest or seizure . . . instead of preceding it"). *United States v. Paepke*, 550 F.2d 385, 389-91 (7th Cir. 1977) (upholding the use of evidence previously deemed inadmissible in a narcotics prosecution where it was relevant to a tax-fraud charge arising from conduct occurring after the narcotics charges were dismissed).

[6]In this regard *Watson* is distinguishable from the present case. In *Watson*, the key factor to the Eighth Circuit's holding was that a "subsequent, separate investigation" initiated after acquisition of the evidence rendered said evidence "sufficiently attenuated from the presumably illegal search so as to purge

In the alternative, had the government wished to avoid exerting investigatory resources, under established Sixth Circuit precedent, it could have simply asserted its typical processes for investigating bank fraud to demonstrate that it would have inevitably discovered the connection between Fofana and Ousmane Diallo. *See Keszthelyi*, 308 F.3d at 574 ("The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.") (internal quotation marks omitted).[7]   The government, however, did not make either effort and instead asks this court to sanction its inaction by allowing it to rely on the illegality for the evidence's admission.  The Fourth Amendment requires more.  With an array of established exceptions providing the government with safety valves to the exclusionary rule's application, it is not only unnecessary but also improper to indulge the government's request.

The conclusion that the majority reaches today is inconsistent with our prior decision in *United States v. Leake*, 95 F.3d 409, 417-418 (6th Cir. 1996), in which this Circuit suppressed evidence discovered pursuant to an illegal search that provided the necessary connection between the defendant and an alias.  In *Leake*, an independent investigation by the Drug Enforcement Agency ("DEA") had been initiated prior to an illegal search of Leake's home by Kentucky police officers.  As a result of the illegal search, the police officers were able to contact Leake's girlfriend, who provided a list of information, which included the fact that Leake's alias was "John Sandusky."  *Id.* Subsequent investigation by the DEA utilizing information resulting from the illegal search led to utility and vehicle registration records in the name of John Sandusky that linked Leake to the conspiracy previously under investigation.  *Id.* at 414.  Although the government admitted that the list provided by the girlfriend that contained the alias was

---

the evidence of any possible taint."  950 F.2d at 507.  The government has presented no evidence of a similar subsequent and separate investigation in this case.

   [7]Such an approach would work equally well in the government's depraved-kidnapper scenario because the government need not continue the expensive city-wide manhunt so long as it could demonstrate that its investigatory procedures would have eventually procured the same result. *See Nix*, 467 U.S. at 449-50.  In the alternative, were the kidnaping victim still alive, the victim's ability to testify by virtue of his or her own free will as to the kidnapper's identity would seem sufficient to attenuate the taint of the initial illegality per *Ceccolini*.

inadmissible, *id.* at 415 n.9, it argued that other evidence thereby derived was admissible pursuant to the inevitable-discovery or independent-source doctrines, *id.* at 417. The court held that all evidence "connecting Leake to the alias 'John Sandusky'" must be suppressed, *id.* at 421, noting that "[w]hile it is conceivable that investigators might have worked their way" to the evidence relating to the alias John Sandusky, "the government has failed to carry its burden of proof" in this regard, *id.* at 418 (citing *Nix*, 467 U.S. at 444-45). I find it is difficult to square the careful exclusion of the alias evidence and the various connections it facilitated to other incriminating evidence in *Leake* with the majority's holding today. There was no evidence linking Fofana to Ousmane Diallo prior to the illegal search, and the government made no effort to demonstrate its ability to establish this link independent of the illegality. Just like *Leake*, this is a case "brimming with lose ends." *Id.* at 418 n.18.

Had the government taken simple, independent investigatory steps to solidify its case against Fofana we would be deciding a very different case today. In fact, we would very likely have a case in which we could unanimously agree that at least one of the established exceptions to the fruit-of-the-poisonous-tree doctrine applied. However, such is not the case before us. As Justice Stevens so aptly stated in *Nix v. Williams*:

> "The majority refers to the 'societal cost' of excluding probative evidence. In my view, the more relevant cost is that imposed on society by police officers who decide to take procedural shortcuts instead of complying with the law."

*Nix*, 467 U.S. at 457 (Stevens, J., concurring) (citation omitted). While it is often the unhappy result of the exclusionary rule that those who are culpable go free, this is the cost of ensuring meaningful protection of important constitutional rights. *See Mapp v. Ohio*, 81 U.S. 643, 659 (1961) ("The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the character of its own existence."). I cannot condone the government's brazen disregard of the Fourth Amendment in this instance. Doing so is inconsistent with prior precedent and diminishes the importance of constitutional liberties. Accordingly, I respectfully dissent.