RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

　　　　　　　　　　*Plaintiff-Appellee*,

　　　*v.*

QUINCINO WAIDE,

　　　　　　　　　　*Defendant-Appellant*.

> No. 21-5827

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:18-cr-00116-1—Karen K. Caldwell, District Judge.

Argued:  December 6, 2022

Decided and Filed:  February 13, 2023

Before:  SILER, GILMAN, and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Patrick F. Nash, NASH MARSHALL, PLLC, Lexington, Kentucky, for Appellant.
Lauren Tanner Bradley, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for
Appellee.  **ON BRIEF:**  Patrick F. Nash, NASH MARSHALL, PLLC, Lexington, Kentucky, for
Appellant.  Lauren Tanner Bradley, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S
OFFICE, Lexington, Kentucky, for Appellee.

　　　GILMAN, J., delivered the opinion of the court in which NALBANDIAN, J., joined.
SILER, J. (pp. 19–21), delivered a separate dissenting opinion.

─────────────

## OPINION

─────────────

　　　RONALD  LEE  GILMAN,  Circuit  Judge. Quincino  Waide  first  encountered  the
Lexington  police  after  a  shed  fire  occurred  on  the  property  next  to  his.   Although  no  one

suspected Waide of having anything to do with the fire, the fire investigator noticed surveillance cameras attached to Waide's duplex residence and asked Waide to turn over his digital video recorder (DVR) to see what it might reveal about the shed fire. When Waide declined, the investigator sought a warrant (the DVR warrant) to enter Waide's apartment and retrieve the DVR.

The affidavit in support of the DVR warrant, however, lacked reliable evidence to establish probable cause to believe that the shed fire was due to arson or any other criminal activity. A state magistrate nevertheless issued the warrant. When the fire investigator and five other officials with the Lexington Police and Fire Departments arrived at Waide's duplex to execute the DVR warrant, their threatened entry and a pointed inquiry about whether Waide had drugs on the premises caused Waide to admit that his apartment contained a small amount of marijuana. This confession led to the issuance of two subsequent warrants (the narcotics warrants) to search both units of Waide's duplex for narcotics. The searches yielded a firearm plus large quantities of drugs and money.

After the district court denied Waide's multiple motions to suppress evidence, he entered into a conditional guilty plea to the offense of possessing cocaine and heroin with the intent to distribute the drugs, in violation of 21 U.S.C. § 841(a)(1), and to the offense of possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1).

Waide now appeals. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** with instructions to suppress the unlawfully collected evidence.

## I. BACKGROUND

### A. Factual background

Chris O'Bryan, an investigator with the Lexington Fire Department, received a call on July 23, 2018 with regard to a fire at 428 Douglas Avenue. At that address was a single-family house surrounded by a chain-link fence. The house itself was not affected by the fire, but a shed in the rear had sustained fire damage. The fire department's incident report, completed on the same day, noted that both the source and the cause of the ignition were undetermined, and

O'Bryan later confirmed that he "didn't have anything to indicate that there w[ere] any accelerants or ignitable liquids used."

O'Bryan testified at trial that he spoke with the incident commander, who informed him that the shed was vacant and had no electric power, but that squatters might have been living on the property. The commander also noted that "it appeared that items had been removed out [of the shed] and potentially set on fire as well."

There was no one present whom O'Bryan could identify as a potential suspect or witness. Prior to leaving the scene that morning, however, O'Bryan noticed "what [he] classified as sophisticated cameras" on the neighboring duplex at 430 Douglas Avenue. Two cameras were on the front porch of the duplex, facing in opposite directions, and a third camera was mounted at the rear.

O'Bryan returned to the scene later that day, where he encountered Dorothy Waide, Waide's mother, outside of 430 Douglas Avenue. Ms. Waide informed O'Bryan that she lived on the first floor of 430 Douglas Avenue, in Apartment 1. According to O'Bryan, Ms. Waide told him that the cameras belonged to her son and that the DVR was on the second floor. He further testified that Ms. Waide told him that her son was unlikely to permit access to the surveillance footage.

O'Bryan also spoke by phone with Andrea Wallace, the nonresident owner of the property located at 428 Douglas Avenue. He told Wallace about the fire and "asked her to ask around" about what might have happened. O'Bryan also asked about the contents of the shed. Wallace informed O'Bryan that the shed had contained items of sentimental value that once belonged to her deceased mother. From "a small pile of [what] looked like burned items," O'Bryan identified some of the objects that Wallace had described.

Soon after his conversation with Wallace, O'Bryan encountered Waide, who allegedly smelled of "what [O'Bryan] thought was marijuana," on the sidewalk in front of 430 Douglas Avenue. O'Bryan asked Waide whether he lived in the building, and Waide responded that he owned it. When O'Bryan asked Waide's permission to view the DVR footage for use in investigating the shed fire, Waide declined.

The next morning, O'Bryan reached out to Wallace again, this time to follow up on his request that she "ask around." O'Bryan testified that, in response, "[b]asically what [Wallace] told [O'Bryan] was the word out there is that somebody pulled up in a vehicle and was . . . seen removing things out of the shed just prior to the fire." When asked by Waide's counsel to clarify this statement, O'Bryan confirmed that he did not know the identity of either the person to whom Wallace spoke or the person who allegedly witnessed the removal of objects from the shed. Wallace had speculated, though, that her ex-husband might have been responsible for the fire "because he was a vindictive person," and because the fire occurred on the morning after the anniversary of her mother's death.

O'Bryan applied for a search warrant to collect the DVR from Waide's second-floor unit, Apartment 3. After the state magistrate issued the warrant, O'Bryan contacted the Lexington Police Department for assistance in its execution. In speaking with the lieutenant on duty, O'Bryan shared his earlier observation that Waide had smelled of marijuana, and he "advised [the on-duty officer] that[,] due to some things that occurred in the initial investigation and the camera system being on the residence[,] . . . there might be illegal narcotic activity occurring at the residence." The lieutenant told O'Bryan to contact the narcotics unit. During all of this, Waide was not suspected of having any involvement in the shed fire.

Two narcotics officers, Jared Curtsinger and Matthew Evans, along with three members of the Arson Bureau, accompanied O'Bryan to 430 Douglas Avenue that same afternoon. When the six-person cadre of officials attempted to execute the DVR warrant, however, no one was in Apartment 3. But Ms. Waide was home in her downstairs apartment. At O'Bryan's request, she asked her son to return to the premises so that the warrant could be executed. Waide and his cousin Vance arrived by car approximately 10 minutes later.

O'Bryan explained to Waide that he and the accompanying officers planned to enter Apartment 3 pursuant to the DVR warrant. Waide then offered to collect the DVR equipment himself, but O'Bryan countered that he intended to execute the warrant regardless. Curtsinger, who had identified himself to Waide as a police officer and was dressed in tactical gear, testified that he "interjected at one point and asked [Waide]—advised him, you know, if he had any drugs

in the apartment, if that's what he was worried about and so forth." In response, Waide admitted that "there may be a little marijuana."

Curtsinger then approached Waide's car, which was parked on the street with the windows down. He testified that he "could smell burnt marijuana coming from the vehicle," and so conducted a search. The search yielded "a marijuana grinder with some marijuana residue in it and a partially smoked marijuana blunt." "[D]ue to the admission that there was marijuana in [Waide's] apartment and the . . . drug paraphernalia that was located in his vehicle," Waide was handcuffed and detained. Curtsinger then left the scene in order to apply for an additional warrant to search Apartment 3, this time for drugs. Unbeknownst to Waide, Curtsinger had, "[d]uring no less than two investigations, . . . been advised by illegal drug traffickers that Quincino Waide was selling large quantities of illegal narcotics in Lexington."

O'Bryan remained with Waide outside of 430 Douglas Avenue. Waide, who was still handcuffed, was "constantly communicating" with his cousin Vance. Vance and Ms. Waide went in and out of Apartment 1 for some time before eventually staying inside and shutting the blinds.

While still waiting for Curtsinger to return, O'Bryan was informed by the other officials that there was noise coming from the duplex—specifically, O'Bryan testified that they told him that "[i]t sounds like they're pulling the ceiling down." O'Bryan became worried that the occupants of 430 Douglas Avenue "may be trying to destroy the DVR."

This concern caused O'Bryan, who had already asked Waide for the key to Apartment 3 "once or twice," to ask again. O'Bryan "told him they were going in based on the fact that [Vance and Ms. Waide] potentially are destroying evidence, and [O'Bryan] thought they were going to destroy the DVR." Waide at last provided the key, and O'Bryan and the officers then entered Apartment 3 to conduct a protective sweep.

In Apartment 3, the officials encountered a large hole leading up from Apartment 1, through which Officer Evans could see a ladder and scattered dry wall and insulation. The officials immediately went to Apartment 1 to ensure that no evidence was being destroyed. They found that the kitchen and bathroom sinks in Apartment 1 were overflowing and clogged with an

unidentified white substance. The officials turned off the water and escorted the occupants out of the dwelling. They did not conduct a complete search of either apartment beyond the protective sweep. But they relayed to Curtsinger what had taken place, and Curtsinger included those events in his search-warrant affidavit for Waide's Apartment 3.

Curtsinger also sought an additional, nearly identical search warrant for Ms. Waide's Apartment 1. He returned two hours later, and all three warrants (the original DVR warrant and the two later-issued narcotics warrants) were then executed. The execution of the warrants culminated in the discovery of a firearm and large quantities of money and drugs, as well as the collection of the DVR.

**B. Procedural background**

A federal grand jury charged Waide with (1) possessing with the intent to distribute 5 kilograms or more of cocaine and 100 grams or more of heroin, (2) possessing a firearm in furtherance of those drug-trafficking crimes, and (3) being a felon in possession of a firearm. Waide filed multiple motions to suppress evidence, arguing in particular that the DVR warrant lacked probable cause, that the "good-faith" exception to the exclusionary rule did not save the warrant, that his incriminating statements were obtained in violation of his *Miranda* rights, and that exigent circumstances did not justify the police entry into his apartment.

The district court denied all of the suppression motions, and Waide subsequently entered a conditional guilty plea to the possession of drugs with the intent to distribute and to the possession of a firearm in furtherance of a drug-trafficking crime. As part of the plea agreement, Waide reserved the right to appeal the district court's suppression rulings. The district court accepted Waide's plea and sentenced him to 180 months of imprisonment.

Waide now appeals. Although three warrants are at play in this case, Waide focuses his challenge on the validity of the DVR warrant. He argues that all evidence obtained after the issuance of that warrant should be suppressed as "fruit of the poisonous tree."

## II.  ANALYSIS

### A.  Standard of review

When reviewing a district court's decision concerning a motion to suppress evidence, an appellate court "review[s] findings of fact under the clear-error standard and review[s] conclusions of law de novo." *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022).  A district court's after-the-fact conclusion that probable cause existed is a legal determination that an appellate court reviews de novo.  *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018).  And "[g]iven the de novo standard of review," an appellate court "owe[s] the district court's conclusion no particular deference."  *Id.* (quoting *United States v. Brown*, 732 F.3d 569, 572-73 (6th Cir. 2013)).

### B.  The affidavit in support of the DVR warrant did not establish probable cause to believe that a crime had been committed

As a threshold matter, one might think that Waide is afforded some protection because he was never suspected of having been involved in the shed fire.  That is not so.  "In situations where the State does not seek to seize 'persons' but only those 'things' which there is probable cause to believe are located on the place to be searched, there is no apparent basis in the language of the [Fourth] Amendment for also imposing the requirements for a valid arrest— probable cause to believe that the third party is implicated in the crime."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978) (holding that the Fourth Amendment does not prohibit the issuance of search warrants simply because the possessor of the property is not suspected of criminal involvement).  Waide does not argue to the contrary.

"Probable cause 'is not a high bar,'" *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)), but neither is it a nonexistent one.  "[T]o establish probable cause for a search, an affidavit must show a likelihood of two things: first, that the items sought are 'seizable by virtue of being connected with criminal activity'; and second, 'that the items will be found in the place to be searched.'" *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (alteration in original) (quoting *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016)); *see also Zurcher*, 436 U.S. at 554 ("[V]alid warrants may be issued to search any property . . . at which there is probable cause to

believe that fruits, instrumentalities, or evidence of a crime will be found." (original emphasis omitted)).

Waide's key contention in the case before us is that the state magistrate was not presented with a "substantial basis" to believe that the shed fire was "connected with criminal activity." *See Abernathy*, 843 F.3d at 249; *Sheckles*, 996 F.3d at 338. In its entirety, O'Bryan's affidavit in support of the DVR warrant reads as follows:

> On the morning of July 23, 2018 a fire investigator was requested to respond to 428 Douglas Avenue for a structure fire. Crews discovered a storage shed in the rear of the home heavily involved in fire. Once extinguished, a fire/arson investigator was requested to respond.
>
> As I began the investigation, it was determined that someone entered the property through one of the two gates in the fence, proceeded back to the rear, where the shed was located. According to the victim, a witness explained to her that someone was observed pulling up to the residence, entering the property and removing items from the shed around the time of the fire. The victim estimated the items stored inside the shed to be valued around $8000. She explained the items stored were antique possessions that belonged to her deceased mother. At the completion of the investigation, the fire has been determined to have been incendiary in nature.
>
> During the course of the investigation, the residence directly next door (430 Douglas Ave), just feet away from one of the two gates on the property where the arson occurred, has evidence to indicate that there is a surveillance camera system on the property. The cameras are located on the exterior and would capture public view outside of the residence at 430 Douglas Avenue, capturing video of the property where the arson occurred.
>
> An attempt was made to get consent from the owner of the property on the afternoon of July 23. He denied giving of any videos captured from his surveillance system.

The only information contained in the affidavit that is proffered to support a finding of probable cause is the statement of an unidentified person made to the unidentified property owner, and then communicated second-hand to O'Bryan, regarding an unknown person entering the property and removing items from the shed around the unspecified time of the fire. When presented with such hearsay information from an undisclosed source, "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information." *United States v. Helton*, 314 F.3d

812, 819 (6th Cir. 2003); *accord United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005). "[I]n the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." *Frazier*, 423 F.3d at 532.

The affidavit in question contains a minimum of two levels of hearsay—from the unidentified property owner and from the unnamed witness, who might or might not have been the person who allegedly observed the relevant incident first-hand. Moreover, the property owner's sole basis for the information included in the affidavit is the word of an unknown third party whose own foundation for providing that information is undisclosed. The affidavit lacks any additional information that might support either source's credibility, such as "averments about the reliability of the information provided by the anonymous informants in the past," "averments about the length of the relationship between [O'Bryan] and the confidential informants," or a "suggestion that [O'Bryan] disclosed the informants' true identities to the issuing magistrate." *See id.* "Nor does the affidavit contain evidence that [O'Bryan] corroborated"—or even attempted to corroborate—"the information that the informants provided." *See id.* Here, as in *Frazier*, the uncorroborated information is not sufficiently reliable to support a finding of probable cause.

The district court's opinion cites additional facts that were collected by O'Bryan during his investigation—including that the house at 428 Douglas Avenue was vacant and that items identified as having been among the shed's contents had been burned on the lawn outside of the shed—that might have been sufficient to establish probable cause to believe that the shed fire was caused by arson. *See United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) ("Probable cause exists 'when there is a "fair probability," given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.'" (quoting *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001))). But O'Bryan's affidavit in support of the DVR warrant did not include any of these facts.

This court has long held that, "[w]hen determining whether an affidavit establishes probable cause, we look only to the four corners of the affidavit; information known to the officer but not conveyed to the magistrate is irrelevant." *Abernathy*, 843 F.3d at 249 (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)). The absence of particularized facts

in a warrant affidavit is fatal to a finding of probable cause because "the information presented must be sufficient to allow the [magistrate] to independently determine probable cause; 'his action cannot be a mere ratification of the bare conclusions of others.'" *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

Aside from the unsubstantiated hearsay assertions discussed above—that an unidentified person saw another unidentified person removing items from the shed around the unspecified time of the fire—the only other relevant facts that can be surmised from the affidavit are (1) that the storage shed had contained antique possessions, valued at approximately $8,000, which once belonged to the property owner's deceased mother; (2) that the shed had been "heavily involved in [a] fire"; (3) that a neighboring property had a surveillance-camera system that might have recorded the events at 428 Douglas Avenue on the night in question; and (4) that the owner of the neighboring property had declined to provide the DVR footage to law enforcement when asked to do so.

That a fire occurred in the storage shed is not itself evidence of a crime. As the Supreme Court has made quite clear, "[t]o secure a warrant to investigate the cause of a fire, an official must show more than the bare fact that a fire has occurred." *Michigan v. Tyler*, 436 U.S. 499, 507 (1978). The affidavit's assertions that the fire was "incendiary in nature" and an "arson," without any additional factual support, was thus a conclusory statement equating the occurrence of a fire with a criminal act. Although the government asserts that requiring additional support to reach such a conclusion "ignores basic common sense" (on the basis that "storage sheds rarely spontaneously combust"), we find its argument unpersuasive. After all, "where the justification for the search is as simple and as obvious to everyone as the fact of a recent fire, a magistrate's review would be a time-consuming formality of negligible protection." *Id.*

Nor does the existence of surveillance cameras attached to Waide's duplex add to a finding of probable cause. A valid search warrant requires reliable evidence that some crime has been committed, *Abernathy*, 843 F.3d at 249, and the mere existence of a home security system does nothing to so suggest. Whether or not the district court was correct in concluding that the affidavit successfully indicated "a fair probability that evidence relating to the shed fire would be

located on the recording equipment mounted on the neighboring property" is therefore irrelevant in determining the sufficiency of the affidavit.

Waide's refusal to voluntarily provide access to the DVR equipment is likewise irrelevant to the probable-cause analysis. A charitable reading of the affidavit might lead one to conclude that the magistrate interpreted Waide's refusal as inherently suspect and indicative of Waide's involvement in the shed fire. But even if this reading did not require numerous interpretive leaps, "[t]he exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt." *United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011).

**C. The incriminating evidence should be suppressed because it stemmed from the exploitation of the unlawful DVR warrant**

> ***1. The fruits of an unlawful search warrant, even if that warrant was not actually executed, should be excluded if the search warrant was otherwise exploited***

Courts are required to suppress evidence that is directly or indirectly "the tainted 'fruit' of unlawful governmental conduct." *Nix v. Williams*, 467 U.S. 431, 441 (1984) (recounting the history of the fruit-of-the-poisonous-tree doctrine). The government insists, however, that "the exclusionary rule and the fruit-of-the-poisonous-tree doctrine contemplate an actual unlawful search, not simply the act of obtaining of a signed warrant that goes unexecuted."

Contrary to the government's position, the Supreme Court has made no distinction between actual and threatened violations of the Fourth Amendment with regard to the suppression of unlawfully obtained evidence. *See Kentucky v. King*, 563 U.S. 452, 469, 472 (2011). We therefore hold that the fruit-of-the-poisonous-tree doctrine may be used to suppress evidence derived from the threatened use of an unlawful warrant.

The government, true enough, cites several instances where the fruit-of-the-poisonous-tree doctrine has been applied to evidence deriving from unlawful searches and seizures actually executed. But it cites no case suggesting that the doctrine applies *only* to such completed searches and seizures. The Supreme Court has in fact recognized that "the 'fruit of the poisonous tree' doctrine has not been limited to cases in which there has been a Fourth

Amendment violation" at all, but has even been applied "where the violations were of the Sixth Amendment, as well as of the Fifth Amendment." *Nix*, 467 U.S. at 442 (citing *United States v. Wade*, 388 U.S. 218 (1967), and *Kastigar v. United States*, 406 U.S. 441 (1972), before applying the doctrine in the Sixth Amendment context (but ultimately concluding that the "inevitable discovery" exception precluded suppression)). What matters is not the particular illegal act that the police have engaged in, but that the challenged evidence is the result of unlawful police conduct. *See id.* at 442-43 ("The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.").

Threatened Fourth Amendment violations have also supported the application of the exclusionary rule more generally. The Supreme Court has observed that the "exigent-circumstances" exception to the warrant requirement is sufficient to preclude suppression "when the police do not gain entry to premises by means of an actual *or threatened* violation of the Fourth Amendment." *King*, 563 U.S. at 469, 472 (emphasis added) (holding that an exigency justified a warrantless search "[b]ecause the officers in this case did not violate or threaten to violate the Fourth Amendment prior to the exigency"). And when presented with the question of "whether a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant," the Court "h[e]ld that there can be no consent under such circumstances." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The Court reasoned that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Id.* at 550.

Such a situation was determined to be inherently coercive, and "[w]here there is coercion there cannot be consent." *Id.* In light of the seriousness with which the Supreme Court has treated threatened Fourth Amendment violations when dealing with the exigent-circumstances and consent exceptions to the warrant requirement, we see no reason why the fruit-of-the-poisonous-tree doctrine should not also serve to exclude evidence obtained by an official declaring his intent to act upon an unlawful warrant.

### 2. The "attenuation" exception to the fruit-of-the-poisonous-tree doctrine is inapplicable in the present case

To exclude evidence under the fruit-of-the-poisonous-tree doctrine, "the defendant must show more than 'the mere fact that a constitutional violation was a "but-for" cause of [the police's] obtaining [the] evidence.'" *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (alterations in original) (quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)). Under the attenuation exception, "the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Hudson*, 547 U.S. at 592)).

The Supreme Court has set forth three factors to guide the attenuation inquiry: "the temporal proximity of the unlawful [conduct] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010) (cleaned up) (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Here, Waide confessed to having marijuana in his apartment during the same conversation in which O'Bryan informed Waide that the officials intended to execute the DVR warrant in their possession. Similarly, Waide provided O'Bryan with the key to search his apartment immediately after O'Bryan again threatened to execute the DVR warrant. In all, the entire encounter took place in the course of one afternoon. Temporal proximity is thus in Waide's favor. *Compare, e.g.*, *id.* (the defendant's immediate confession and the subsequent discovery of tangible evidence following the unlawful action weighed against finding attenuation), *and Brown*, 422 U.S. at 604 (two hours between the unlawful action and the defendant's confession weighed against finding attenuation), *with United States v. Elmore*, 18 F.4th 193, 200-01 (6th Cir. 2021) (two months between the searches and the discovery of evidence weighed in favor of finding attenuation), *and United States v. Gross*, 662 F.3d 393, 402 (6th Cir. 2011) (two months between the unlawful seizure and the defendant's confession weighed in favor of finding attenuation).

Nor were there any intervening circumstances between the threatened execution of the unlawful DVR warrant and the discovery of the challenged evidence. The affidavits that sought

the narcotics warrants authorizing searches of the two 430 Douglas Avenue apartments satisfied the probable-cause requirement only because of information that had been obtained by that threat. As Curtsinger testified, and as the government argues, the primary basis for the narcotics warrants was Waide's confession about the presence of marijuana in his apartment.

But Waide confessed only because of the officials' threat to execute the unlawful DVR warrant. When O'Bryan informed Waide that the officials intended to execute the DVR warrant, Curtsinger affirmatively "interjected at one point and asked him—advised him, you know, if he had any drugs in the apartment, if that's what he was worried about and so forth." And a confession "made in response to a question posed by [an officer] [] is not the kind of 'intervening spontaneous action' that typically supports attenuation." *See Williams*, 615 F.3d at 669 (finding no attenuation where an officer had asked a question that prompted the incriminating response).

To the extent that the marijuana residue in Waide's car contributed to the officials' suspicions, it too was discovered only because of the threatened execution of the DVR warrant. Waide's vehicle was not present at the scene until Ms. Waide called her son and asked him to return to the duplex so that the officials could execute the DVR warrant.

The only other possible basis for the establishment of probable cause—the evidence observed during the protective sweep of the 430 Douglas Avenue duplex—was likewise brought about by the threatened execution of the DVR warrant. Nothing in the record suggests that the occupants of the duplex would have begun destroying evidence for any reason other than the imminent threat of unlawful police entry. Moreover, O'Bryan obtained the key to enter Apartment 3 only after telling Waide that the officials intended to enter the apartment to prevent the destruction of the DVR. Under these circumstances, the second attenuation factor also favors Waide. *See id.* at 669-70 (citing cases where the court found no intervening circumstances where those circumstances were entangled with the unlawful police conduct).

Finally, Curtsinger's purpose in exploiting the unlawful DVR warrant weighs against finding attenuation. "The Supreme Court has explained that the purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully [act] 'in the hope that something might turn up.'" *Id.* at 670 (quoting *Brown*, 422 U.S. at 605). Here, Curtsinger had

already been aware that the sought-after DVR footage might show "illegal narcotic activity occurring at the residence." He also stated in his affidavits in support of the narcotics warrants that he had received tips that Waide was a drug trafficker, "and toward that end[, Curtsinger] immediately asked several questions related to criminal activity other than" arson. *See id.* at 670-71. The challenged evidence thus "came out *only because [Curtsinger] asked about it*," which this court has held is indicative of a purpose weighing against a finding of attenuation. *See id.* at 671 (emphasis in original).

### 3. The "inevitable-discovery" exception to the fruit-of-the-poisonous-tree doctrine is also inapplicable in the present case

Suppression of evidence is similarly not required under the "inevitable-discovery" exception to the fruit-of-the-poisonous-tree doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022). This court "recognize[s] two scenarios in which inevitable discovery operates. First, the doctrine applies when there is 'an independent, untainted investigation' that was bound to uncover the same evidence. . . . Inevitable discovery also applies when 'other compelling facts' demonstrate that discovery was inevitable." *Id.* (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995)).

The first scenario does not apply in the present case because, although the narcotics unit might have previously shown interest in Waide, the unit's participation in the execution of the DVR warrant meant that its investigation was neither independent of nor untainted by that warrant. *Cf. id.* (citing "two parallel, independent efforts to locate a victim's corpse: an interrogation by detectives and a volunteer grid search" as an example of "an independent, untainted investigation").

Nor can suppression be avoided by means of the second scenario. Although the affidavits in support of the narcotics warrants contained other facts that implicated Waide in criminal activity—such as tips from unnamed sources that Waide was responsible for trafficking large quantities of narcotics throughout Lexington, and the discovery of marijuana paraphernalia in Waide's car—those facts would not have justified the issuance of a search warrant to enter Waide's apartment. *See, e.g.*, *United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016)

("[O]ur cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer.").

## D.  The "good-faith" exception to the exclusionary rule is also inapplicable

This leaves the "good-faith" exception to the exclusionary rule for consideration.  In *United States v. Leon*, 468 U.S. 897, 920 (1984), the Supreme Court held that evidence obtained pursuant to an invalid warrant need not be suppressed "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." But an officer does not act in objective good faith if the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  *Id.* at 923 (quoting *Brown*, 422 U.S. at 610-11 (Powell, J., concurring in part)).

The question before us is whether *Leon*'s good-faith exception should apply where the affidavit in support of the DVR warrant failed to establish probable cause to believe that a crime had been committed in the first instance.  We hold that it does not.  In *United States v. Christian*, 925 F.3d 305, 313 (6th Cir. 2019) (en banc), this court identified its decision in *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006), as "showing just how unsubstantiated an affidavit must be to fail to qualify under *Leon*'s good-faith exception."  The affidavit at issue in *Hython* read as follows:

> Narcotics Officers from the Steubenville Police Department, Toronto Police and Jefferson County Sheriff's Office in a joint investigation conducted a controlled buy of crack cocaine from 241 South Fifth Street in the city of Steubenville.
>
> A reliable confidential informant advised officers that he was able to purchase crack cocaine from a female in Toronto.  The female had advised the informant in the past that her source of crack cocaine is subject in the city of Steubenville.  Officers provided the informant with one hundred and fifty dollars in marked U.S. currency for a transaction.  Officers conducted surveillance and were able to follow the informant to the known drug location in Toronto where the informant met with the female suspect.  Officers were able to hear conversation via an audio transmitter.  During the conversation the female received the currency from the informant and advised that she would travel to

Steubenville to obtain the crack cocaine. Officers were then able to follow the female to 241 South Fifth Street in the City of Steubenville. The female entered the residence and exited within two minutes. Officers were then able to follow the female back to Toronto where she met with the informant and provided him with a baggie containing crack cocaine.

Due to the above transaction with the residence, officers believe the[re] to be further crack cocaine within the residence.

*Hython*, 443 F.3d at 482-83 (alteration in original). The court concluded that this affidavit was not protected by the good-faith exception because "it was based on one undated, acontextual controlled buy." *Id.* at 489. Consequently, "a well-trained officer could not reasonably rely on the affidavit." *Id.*

Yet the affidavit at issue in *Hython*, flawed as it was, contained at least one assertion of criminal activity from a source whose reliability was attested to in the affidavit. *See id.* at 482-83. Moreover, the evidence sought to be seized was contraband, and so "[t]he nexus between 'criminal activity' and the item to be seized [was] 'automatic.'" *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016)). As discussed in Part II.B. above, the affidavit in support of the DVR warrant fell well short of even this low standard.

Finally, the affidavit's deficiencies cannot be cured by looking to facts known to O'Bryan that were omitted from the affidavit. This court has been unequivocal in holding that that "a determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit." *United States v. Laughton*, 409 F.3d 744, 751 (6th Cir. 2005). And although "a court reviewing an officer's good faith under *Leon* may look beyond the four corners of the warrant affidavit to information that was known to the officer and revealed to the issuing magistrate," *United States v. Frazier*, 423 F.3d 526, 535-36 (6th Cir. 2005), the record in this case is devoid of evidence that the magistrate who issued the DVR warrant had been provided with any information beyond that presented in the affidavit.

In sum, the DVR warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *See Leon*, 468 U.S. at

923 (quoting *Brown*, 422 U.S. at 610-11 (Powell, J., concurring in part)).  The *Leon* good-faith exception is therefore inapplicable.

### III.  CONCLUSION

This court has previously proclaimed that, "[a]lthough we do not relish the consequence that the possessor of a large quantity of drugs will escape punishment, our overriding concern is that the police must abide by the Fourth Amendment protections afforded to all of the inhabitants of this great country, guilty and innocent alike."  *United States v. Wilson*, 506 F.3d 488, 496 (6th Cir. 2007).  That core principle is fully applicable here.  We therefore **REVERSE** the judgment of the district court and **REMAND** with instructions to suppress the unlawfully collected evidence.

—————————

## DISSENT

—————————

SILER, Circuit Judge, dissenting.  I respectfully dissent from the majority opinion.  This is not a fruit of the poisonous tree case.  As stated by the Supreme Court:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (citation omitted).  Unlike the facts in *Wong Sun*, the officers here were not illegally inside of a dwelling when Waide made his incriminating statement that there was marijuana in his apartment.

In the arson investigation on the first day at the scene, Waide's mother met the investigators and said the cameras on the building near the burned building belonged to her son and that he would probably not release the footage from the camera attached to his apartment.  They also spoke with Waide at that time and smelled marijuana on him.  Waide refused to release the footage from the camera.  The following day, the same investigators, accompanied by narcotic officers Curtsinger and Evans, obtained a state search warrant for the DVR.  When they arrived at the premises, no one was home in Apartment 3, which was the object of the search warrant.  The officers asked Waide's mother if she could call Waide to the scene, which she did, and Waide arrived shortly thereafter.

When Waide arrived, the officers told him that they had a search warrant for the DVR and recording equipment for Apartment 3.  Waide said he could go up to his apartment and get the recording equipment for them, but they said they would just execute the DVR warrant.  Detective Curtsinger asked Waide if he had marijuana or other drugs in the apartment, and Waide responded by saying he had "a little marijuana."  Curtsinger walked over to Waide's vehicle parked on the street and smelled marijuana coming from the car.  He also looked through the windows of the vehicle and spotted a burnt marijuana cigarette and grinder.  The officers

then decided to get another warrant to search for marijuana inside the apartment. At that time, there was no execution of the DVR search warrant, nor had the officers entered Waide's apartment. While Curtsinger went to obtain the search warrant for the marijuana, Waide was placed in handcuffs in the area near his apartment, but not inside. Officers then saw suspicious conduct around Apartment 1, just below Apartment 3 where Waide lived. They heard banging noises from inside Apartment 1 and heard sounds from within Apartment 3, which was not supposed to have anyone inside. Officers then made a clearing search of Apartment 1 and found a large hole between Apartments 1 and 3. Although they secured both apartments, they did not execute the warrant at that time. It was only later the narcotics warrant was executed, and the firearm and narcotics were found inside the apartments.

Yet, the majority suggests that there was coercion when the investigator said they would proceed to execute the DVR warrant, Curtsinger then asked Waide about drugs inside, and Waide admitted he had some marijuana in his apartment. The majority says this was a threat. I disagree. Waide did not have to say anything when he was asked if he had drugs inside. He was not under arrest nor handcuffed and was outside his apartment.

Put simply, there is no fruit from a poisonous tree here because there is no poisonous tree. Waide asserts that the first warrant, the DVR warrant, lacked probable cause, so the entire search should be suppressed. However, the DVR warrant was never executed. Instead, the officer suggested they would execute it, which gave rise to Waide's admission of the drugs in his apartment.

The majority relies upon cases that are unlike the situation we have here. For instance, in *Kentucky v. King*, 563 U.S. 452, 469, 472 (2011), the Court's concern was whether the officers invited the exigent circumstance that the government relied upon to justify the search. Here, Waide does not claim that the officers invited exigent circumstances, so those facts do not support the conclusion of the majority. In the case of *Bumper v. North Carolina,* 391 U.S. 543, 549 (1968), the Court reasoned that where law enforcement had already asserted in bad faith that they had a warrant, the homeowner's consent was invalid. Here we have a warrant and there was no question of consent. The majority has also cited to *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010), but the circumstances there were much different because they concerned

questions posed to the suspect while then in custody. In our case, Waide was not in custody when he admitted the marijuana possession so he was not under the pressure of the defendant in *Williams*.

Instead, I would follow the decision in *United States v. Elmore*, 18 F.4th 193, 200-02 (6th Cir. 2021), where our court found that there was attenuation from the time of the alleged unconstitutional conduct and the time that the search was made with a valid warrant of Apartment 3. In our case, the alleged unconstitutional act was the suggestion by the investigator that the first warrant would be executed. Once Waide admitted having drugs in his apartment, there was a lapse of several hours before the second warrant was brought to the scene and executed. The next attenuation factor in this case favors the government, as Detective Curtsinger noticed evidence of the marijuana residue in the open vehicle on the premises.

The final attenuation factor also favors the government. When Curtsinger learned that Waide had some marijuana in his apartment, he stopped the execution of the DVR warrant to apply for a search warrant for narcotics in the apartment. The fact that the officers heard and saw conduct by others to disturb the contents of Apartment 3 was an intervening act which officers thought was the destruction of illegal drugs, allowing them to enter the apartment to stabilize the contents until a warrant could be obtained. *See also United States v. Hearn*, No. 22-5093, 2022 WL 3211097, at *3 (6th Cir. Aug. 9, 2022) (even if the frisk was unconstitutional, it bore no fruit). Therefore, I would uphold the decision of the district court. The tree here was not poisonous.