NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0516n.06

Case No. 22-3789

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 12, 2023
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| ANDRE BADLEY, | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: BOGGS, READLER, and DAVIS, Circuit Judges.

STEPHANIE D. DAVIS, Circuit Judge. In March 2021, members of the Shaker Heights Police Department ("SHPD") executed a search warrant at the home of Defendant, Andre Badley. Officers obtained the warrant after taking a series of investigative steps that culminated in a controlled purchase of crack cocaine ("crack") by a confidential informant ("CI") from Badley about two days before the warrant was issued. While searching Badley's home, officers seized various quantities of controlled substances, drug paraphernalia, cash, firearms, and ammunition. Based on the crack Badley had sold to the CI and the evidence uncovered through the search warrant, the government obtained an indictment from a grand jury. Badley was tried and convicted on four counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C), and one count of being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

Prior to his conviction, Badley filed a motion to suppress the evidence collected during the search of his home, or alternatively, for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) ("*Franks* hearing"). Badley argued that, despite the issuance of the search warrant by a neutral judicial officer, the police lacked probable cause to search his home because the affidavit supporting the warrant did not establish a nexus between his home and drug-trafficking activities. As for his request for a *Franks* hearing, he contended that the affidavit contained false information that undermined the integrity of the search. He now appeals the district court's denial of his motion to suppress, largely reprising these same arguments. He also appeals the district court's imposition of a 51-month sentence for a supervised released violation, to be served consecutive to his 188-month sentence for the 2021 offenses. In that regard, he argues that his supervised release term for a prior offense, committed in 1995, expired long before he committed the 2021 offense because the district court reduced his 1995 sentence to time served. Because the affidavit supporting the search warrant for Badley's home amply supported a finding of probable cause and, contrary to Badley's contention, he remained on supervised release when he committed the instant offenses, we affirm.

## I.

*Factual Background.* In 1995, Badley was charged with possession with intent to distribute more than 50 grams of cocaine base ("crack") and possession with intent to distribute more than 50 grams of powder cocaine, both in violation of 21 U.S.C. § 841(a)(1). Because of the drug quantities involved and Badley's record of prior felony drug offenses, the government filed an information for enhanced statutory penalties if he was convicted. The case proceeded to trial and Badley was convicted on both counts. The district court sentenced him to the applicable enhanced statutory penalty: a mandatory term of life in prison. After enactment of the First Step Act in 2018

("the Act"), which, among other things, reduced the sentence-length disparity between crack and powder cocaine convictions and changed the manner in which prior felony drug convictions triggered sentencing enhancements, Badley filed a motion asking the district court to reduce his life sentence, as permitted by the Act. Under the Act, Badley's convictions would have required a 10-year mandatory minimum sentence rather than a mandatory life term. On resentencing in February 2019, the court sentenced Badley to time served and ordered his immediate release since he had already served approximately 24 years in prison. The district court also imposed an eight-year term of supervised release.

Approximately two years later, a CI met with Detective Chris Spinos of the SHPD in Shaker Heights, Ohio, and advised him that Badley was selling crack in the area. The informant also identified (1) the general area where Badley lived—Garfield Heights, Maple Heights, and Bedford; (2) two cars that Badley drove—a black Chevrolet Trailblazer and a black BMW; and (3) Badley's girlfriend's nickname—"Ash." According to Detective Spinos, this CI had provided information against the CI's own penal interest; information the CI offered had been investigated and deemed credible; and Detective Spinos considered the CI to be trustworthy and reliable. Indeed, vehicle registration records confirmed that Badley owned one of the vehicles the CI had accurately identified. Business records also showed that, within the last year, Badley had registered a limited liability company ("LLC") at an apartment in Bedford, Ohio.

Officers went to that location, which was in a large apartment complex at 646 Turney Road. They saw Badley's car and a second car that matched the description the CI had given. With the assistance of a postal inspector, officers verified that Badley received packages at a particular unit in the apartment complex. They also learned that a woman named Ashley Thorpe received

packages at the same apartment unit. The first name "Ashley" was consistent with the nickname "Ash" that the CI had provided officers.

On March 1, 2021, the CI made a controlled purchase of crack from Badley under the supervision of officers from the SHPD. Detective Spinos searched the CI for drugs, money, and contraband before providing him with cash containing recorded serial numbers to make the purchase from Badley. The CI also wore a "body wire" through which the CI could relay conversations to Detective Spinos. Shortly after the CI placed a monitored phone call to Badley to set up the transaction, another detective stationed in the parking lot outside of Badley's apartment building watched Badley exit the front door of his apartment building and enter the black BMW the CI had previously identified. According to the search-warrant affidavit, Badley's vehicle "was monitored by members of your Affiant's squad until the time it arrived and [met] with the CI." (R. 25-1, PageID 199). Once Badley arrived at the location for the controlled buy, he exchanged crack for cash.

Within 48 hours of the controlled buy, Detective Spinos requested a state search warrant for Badley's apartment. In support of the warrant, Detective Spinos submitted an affidavit detailing the above facts to a Cuyahoga County Court of Common Pleas judge. Detective Spinos also provided information about his professional law-enforcement background and explained that, based on his training and experience, drug traffickers routinely "store quantities of controlled substances, weapons, ammunitions, and proceeds of drug sales . . . in their residences," as well as records about their transactions, including on electronic devices. (*Id.* at 199). Finding probable cause to search, the judge issued the warrant. The resulting search uncovered drugs (marijuana, crack, powder cocaine, and a mixture containing heroin, fentanyl, and tramadol), digital scales, drug paraphernalia, $5,000 cash, and two firearms and ammunition.

*Procedural Background.* A federal grand jury indicted Badley on multiple charges, including four counts of possession with intent to distribute a controlled substance and one count of being a felon in possession of a firearm. Badley moved to suppress the evidence seized during execution of the search warrant at his apartment. He principally argued that the supporting affidavit lacked probable cause on its face because it did not establish a nexus between his residence and drug trafficking. Badley also alleged that the search-warrant affidavit contained material omissions and false information. Specifically, Badley took issue with Detective Spinos's statement in the warrant affidavit that "[t]his vehicle was monitored by members of your Affiant's squad until the time it arrived and meets with the CI." (*Id.* at 199). In support of Badley's request for a *Franks* hearing, he attached a supplemental report from the SHPD that documented Sgt. Eric Conwell's statement that the squad performed a "loose tail of the target." (R. 43, PageID 363). The report also indicated that while Sgt. Conwell lost continuous sight of the target, both he and Badley arrived within a minute of one another at the controlled-buy location, thus making it "improbable [that] the target had time to stop during his travels." *Id.* at 363–64. Badley argued that because the officers lost sight of his vehicle at one point, the statement that his vehicle was monitored "until the time it arrived" at the controlled-buy location was false and grossly misled the judge who issued the warrant.

The district court denied Badley's motion to suppress evidence and his request for a *Franks* hearing. In denying the *Franks* hearing, the district court held that Badley had failed to make a substantial preliminary showing that the affidavit included a knowingly and intentionally false statement or a statement made with reckless disregard for the truth. The court found that Badley's argument fell short for several reasons, including the fact that "the initial sentence of the same paragraph of the affidavit read[]: 'Affiants avers that the CI travelled to the area in the City of

Cleveland while under *constant surveillance* by members of your affiant's squad.'" (*Id.* at 364) (emphasis in original). The district court observed that this language made clear that when the affiant wanted to convey a view that surveillance occurred without interruption, the affiant carefully chose language to reflect that fact. The court also found that the use of the term "monitored," contrary to Badley's contention, does not denote "constant surveillance." (*Id.* at 365). Finally, the district court held that the affidavit did not lack probable cause on its face because there was a nexus between Badley's residence and the crime, as Badley engaged in drug-trafficking activities while present at 646 Turney Road when he took a monitored call to arrange the controlled buy and emerged from the residence shortly after the offer to sell was made.

Badley exercised his right to trial and was convicted on all counts of the indictment. Badley's advisory Guidelines range was 151-188 months and, based on the drug amount involved, he faced a mandatory minimum sentence of 10 years' imprisonment on two of the counts. At sentencing, the court imposed a within-Guidelines sentence of 188 months, to be followed by 8 years of supervised release. The court also imposed a consecutive 51-month sentence for the supervised-release violation arising from his 1995 conviction. Badley timely appealed.

**II.**

We review a district court's decision on a motion to suppress evidence for clear error as to factual findings and de novo as to conclusions of law, viewing the evidence in a light most favorable to the government. *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020). Moreover, "we give 'great deference' to the state judge's initial probable-cause conclusion when issuing the warrant, asking merely whether the judge had a 'substantial basis' for that conclusion." *United States v. Sheckles*, 996 F.3d 330, 337–38 (6th Cir.), *cert. denied*, 142 S. Ct. 717 (2021) (quoting first *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018), then *United States v. Allen*, 211

F.3d 970, 973 (6th Cir. 2000) (en banc) (citations omitted)). We will uphold the denial of a motion to suppress "if the district court's conclusion can be justified for any reason." *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019) (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)). We also review whether the district court correctly applied the laws regarding supervised release de novo. *United States v. VanHoose*, 437 F.3d 497, 501 (6th Cir. 2006); *United States v. Marlow*, 278 F.3d 581, 583 (6th Cir. 2002).

### III.

*Probable Cause Determination.* The Fourth Amendment protects the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. It provides that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." *Id.* A finding of "[p]robable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (quoting *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018)). Supporting this notion, "[t]ime and again the Supreme Court has emphasized that probable cause is not a high bar to clear." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks and alterations omitted)). Still, there is no probable cause where there is no nexus between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 289 (2021) (citing U.S. Const. amend. IV). To uphold the adequacy of the search-warrant affidavit, "[t]here must be a fair probability that the specific place that officers want to search will contain the specific things that they are looking for." *Id.* We assess nexus on a case-by-case basis, and our decisions reflect the difficulty in distinguishing between the myriad, often overlapping, fact patterns involving drug trafficking. *See id.* ("Courts have drawn fine lines between cases with 'little to distinguish' those

that find probable cause from those that do not.") (quoting *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985)). Yet, even recognizing such difficulties, the warrant to search Badley's apartment fits comfortably among those where we have upheld probable cause findings.

Badley's principal argument is that the search-warrant affidavit failed to establish the requisite nexus between his residence and his drug-dealing activities. To determine whether a warrant was supported by probable cause, "we look only to the four corners of the affidavit." *United States v. Waide*, 60 F.4th 327, 337 (6th Cir. 2023) (quoting *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016)). And the question of whether an affidavit establishes a proper nexus is resolved by examining the "totality-of-the-circumstances" presented. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Admittedly, our jurisprudence is not entirely clear as to whether a defendant's status as a drug dealer, standing alone, is sufficient to establish a nexus between his residence and drug activities. *See United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018) (collecting cases). But other evidence linking the drug dealing to the residence does. *Reed*, 993 F.3d at 448. For instance, we have found a sufficient nexus where the affidavit established that the defendant left a residence after the arrangement of a controlled buy and "drove straight to the drug deal in which he was the seller." *See Jones v. United States*, 817 F.3d 489, 491–92 (6th Cir. 2016). And we reached the same conclusion in a case where "the affidavit in support of the residential search warrant established that [the defendant] was an active drug trafficker, that the . . . address [to be searched] was [the defendant's] home, and that both of [the defendant's] vehicles were regularly parked there." *United States v. Coleman*, 923 F.3d 450, 457 (6th Cir. 2019). The affidavit in *Coleman* further provided that "agents had conducted three controlled buys of cocaine from [the defendant] and observed him drive directly from his condo to the site of the most recent buy, less

than two weeks before the warrant issued." *Id.*; *see also United States v. Miller*, 850 F. App'x 370, 373 (6th Cir. 2021) (citing additional cases).

Here, Badley's case is analogous to *Jones*, *Coleman*, and other cases where law enforcement observed a defendant driving directly from the residence to be searched to the controlled-buy location. The warrant affidavit explained that Badley was inside the residence when he took the CI's phone call placing an order for crack, and minutes later Sgt. Conwell observed Badley leaving the residence and traveling to the controlled buy. The combination of these facts provided a substantial basis to believe that Badley was trafficking drugs, and that drugs or drug paraphernalia might be found inside his residence. *See United States v. Houser*, 752 F. App'x 223, 226–27 (6th Cir. 2018) (stating that officers witnessed the defendant leave from and then return to his apartment immediately before and after selling crack cocaine, thus establishing a sufficient nexus to search the residence for drug-related evidence); *see also United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008) (finding that nexus exists between a known drug dealer's criminal activity and residence when the defendant traveled directly from his home to a drug transaction).

What's more, the affidavit established that Badley lived at the searched address as officers observed him exiting from the front door of the address, parking his car(s) there, and receiving packages through the postal service there. He was further tied to the address by records showing he had registered an LLC at that same apartment. Beyond the facts specific to Badley, the affiant, Detective Spinos, also detailed parts of his training and experience pertaining to the likelihood of finding contraband and evidence of drug trafficking at the homes of active drug dealers. In that regard, Detective Spinos attested to the fact that he had eight years of experience, had participated in hundreds of arrests and criminal prosecutions in a variety of areas, and had received training in

criminal activity and drug interdiction. And most relevant here, he explained that "based on his training and experience, persons who engage in drug trafficking do not keep all contraband on their persons, but routinely store quantities of controlled substances, weapons, ammunitions, and proceeds of drug sales including currency, in their residences." R. 25-1, PageID 199; *see United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996) (holding that it is reasonable to defer to the attesting officer's expertise for purposes of establishing probable cause for a search). Finally, the affidavit also provided information about the CI's reliability—a factor that we have previously determined lends weight to the probable cause determination. *See e.g.*, *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc). In that regard, the attesting officer explained that (1) the CI had provided information against his penal interest; (2) the CI's information was found to be credible, reliable, and accurate; and (3) police corroborated the information through a controlled purchase of crack from Badley (which Badley does not dispute). *See United States v. Howard*, 632 F. App'x 795, 799 (6th Cir. 2015) (finding that the facts contained in the affidavit bolstered informant's veracity and that a controlled buy described in the affidavit corroborated informant's tip). Based on the totality of the circumstances, the issuing judge rightly concluded that there was a nexus between Badley's apartment and drug trafficking, and that officers possessed probable cause to search it.

Badley, nevertheless, insists that the affidavit was inadequate on its face to create a substantial basis for concluding that a search would uncover evidence of illegal activity.[1] He faults the affidavit for failing to disclose that Sgt. Conwell lost sight of him while en route to the location of the controlled buy—a fact that he suggests compromised the integrity of the entire operation. The relevant paragraph from the affidavit reads, in pertinent part, as follows:

---

[1] Badley does not challenge the district court's denial of his *Franks* hearing in this appeal.

> Affiant avers that the CI travelled to the area in the City of Cleveland while under constant surveillance by members of your affiant's squad. Additionally, surveillance was conducted by members of your Affiant's squad at Andre Badley's residence at 646 Turney Road. Shortly after the offer to sell was made . . . a male identified as Andre Badley, was observed exiting the front door of 646 Turney Road. Badley was observed entering a 2011 black BMW . . . This vehicle was monitored by members of your Affiant's squad until the time it arrived and meets with the CI.

R. 25-1, PageID 198–99. Badley contends that the affidavit's use of the word "monitoring" amounts to a false statement that cannot be saved by the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984). Badley also asserts that the district court should have looked only to the four corners of the document rather than also considering any police reports in denying his motion to suppress. Badley's arguments are without merit.

While Badley contends that the gap in surveillance undermines a finding of any nexus between his apartment and drug-trafficking activities, his argument is not supported by Sgt. Conwell's supplemental investigative report on which he rests his challenge. In the report, Sgt. Conwell stated that he took the most direct route to the controlled buy and that while he lost continuous sight of Badley, both he and Badley arrived at the buy location at roughly the same time. As the district court properly observed, it therefore strains logic to believe that Badley had the time to stop at a different stash location and arrive within a minute of the tailing detective. Moreover, beyond arguing this "possibility," Badley offers no support for it.

And Badley's argument that the search-warrant affidavit somehow misstates these facts fares no better. The affidavit accurately conveyed the level of surveillance on Badley. The affidavit stated that Badley's vehicle was "monitored" until the time he met with the CI. (R. 25-1, PageID 199). Unlike the language used to describe the surveillance of the CI earlier in the same paragraph, the affidavit did not state that Badley was under "constant surveillance." *Id.* at 198. Instead, it relayed that he was monitored from his apartment to the buy location. This distinction

is significant because it indicates that the monitoring of Badley's vehicle was different from the level of surveillance placed on the CI. Rather than suggesting dishonesty, it suggests an effort by the affiant to exercise precision in his description, thereby dispelling any indication that he intended to mislead the issuing magistrate.

With regard to Badley's claim that the district court should have considered only the four corners of the affidavit in ruling on his motion to suppress, we do not agree that the district court failed to do so. The district court carefully examined the investigative report in relation to Badley's reliance on the report in his request for a *Franks* hearing. But outside of its *Franks* analysis, the district court's only other mention of the report was to demonstrate that it did not undermine the affidavit's establishment of a sufficient nexus—not that it somehow supported such a finding. The court therefore found that the affidavit gave rise to a fair probability that Badley was trafficking drugs, and that drugs or drug paraphernalia might be found inside his residence. Accordingly, the affidavit was sufficient to establish probable cause to search Badley's residence.

*Good-Faith Exception.* Even were we to conclude that the affidavit was insufficient to establish probable cause to search Badley's residence, suppression still would have been unwarranted under the good-faith exception set forth in *Leon*. The good-faith exception is premised on the idea that the "exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916. The relevant question therefore is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 922 n.23). A conclusion that the officers did not act in good faith is appropriate under only four circumstances: (1) the issuing judge was misled by information in the affidavit and the affiant knew the information was false; (2) the issuing judge abandoned his

or her judicial role; (3) the warrant was so lacking in indicia of probable cause that official belief in its existence was unreasonable; or (4) the warrant was so facially deficient that it could not be reasonably presumed valid. *United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008); *see also Leon*, 468 U.S. at 923.

Badley argues that the affidavit contained a false statement that he was monitored after leaving his apartment until the time of the controlled buy, which renders *Leon*'s good-faith exception inapplicable. But as we have explained, the statement was not false, as it accurately detailed the officers' level of surveillance on him. Moreover, to the extent that Badley's argument implicates the third prong of *Leon*, this too fails. A search warrant lacking in probable cause will be upheld so long as the affidavit includes facts that draw a "plausible connection" between the criminal activity at issue and the residence to be searched. *Brown*, 828 F.3d at 385–86. In other words, an affidavit is not bare bones where the nexus between drug activity and the inside of the residence is at least "minimally sufficient." *Reed*, 993 F.3d at 450. In this case, Badley accepted the call for the controlled buy while he was in the searched residence and left the residence shortly after to travel directly to the buy location. Once there, Badley gave the CI crack in exchange for money. These facts are therefore "minimally sufficient" to show a plausible connection between the drug activity and the 646 Turney residence.

*Supervised-Release Violation Sentence.* When Badley requested relief under the First Step Act, he asked the district court to release him so he could immediately begin his term of supervised release. He also told the district court that it was required to impose an eight-year term of supervised release—the statutory minimum. The district court's amended judgment—consistent with Badley's motion—imposed that term. Badley now argues that he was not on supervised release at the time of the instant offense because his sentence in the 1995 case was reduced to ten

years pursuant to the First Step Act and he had already served twenty-four years, thus making all time retroactive. Badley reasons that, based on his sentence reduction, he should have been released from prison in 2005 and thus off of supervised release in 2013. That argument, however, does not comport with unambiguous statutory language.

The term of supervised release "commences on the day the person is released from imprisonment." 18 U.S.C. § 3624(e). Further, "[a] term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, state, or local crime unless the imprisonment is for a period of less than 30 consecutive days." *Id.* Thus, the plain language of the statute establishes that Badley's eight-year term of supervised release began when he was released from prison, on or shortly after February 15, 2019. Moreover, the Supreme Court unanimously rejected the claim that Badley is making here—that a defendant whose sentence was reduced to time served should have any "excess" time credited against his supervised-release term. *See United States v. Johnson*, 529 U.S. 53, 59 (2000). Relying on § 3624(e)'s plain text, the Court held that because supervised release, unlike incarceration, is intended to provide offenders with post-confinement assistance, it was not interchangeable with imprisonment. *Id.* at 60. A term of supervised release therefore does not run concurrently with a term of imprisonment; it runs only after imprisonment concludes. *Id.* at 57–58. As such, Badley's supervised released began when he was released from prison in 2019, and he was still legally under supervision in March of 2021. Accordingly, we hold that the district court properly imposed a 51-month sentence for Badley's supervised release violation.

**IV.**

For the foregoing reasons, we AFFIRM Badley's convictions and sentence for drug and firearm offenses in his 2021 case and his sentence for his supervised-release violation from his 1995 case.